**JOHNSON COUNTY MEMORIAL HOSPITAL, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, as Secretary of Health and Human Services, Paul Willging, Ph.D., as Deputy Administrator, Health Care Financing Administration, Defendants.**

No. IP 80–258–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 19, 1983.

William S. Hall, Indianapolis, Ind., for plaintiffs.

Sarah Evans Barker, U.S. Atty., Indianapolis, Ind., for defendants.

## MEMORANDUM OF DECISION

DILLIN, Chief Judge.

This case represents a challenge by 61 Indiana hospitals, which participate as providers of services under the Medicare program, to a reimbursement policy of the Department of Health and Human Services ("HHS"), the federal agency having administrative responsibility for the program. The hospitals claim that they are not being reimbursed sufficiently because of the practice of HHS to include patients in the maternity labor/delivery area of hospitals as users of "routine services" in the computation of the average per diem cost of routine patient care. The amount of Medicare reimbursement is calculated from this average per diem cost figure.

The providers' assertion, in essence, is that the effect of this practice is contrary to the guiding reimbursement principles of the Medicare Act and the regulations of the Secretary of Health and Human Services ("Secretary") because it results in an assumption of Medicare patients' debts by non-Medicare sources. The case now comes before the Court on cross-motions for summary judgment. Jurisdiction exists under 42 U.S.C. § 1395oo (f)(1).

### Background

The Medicare program was enacted for the purpose of providing for the health care needs of the nation's elderly and certain disabled persons. 42 U.S.C. § 1395, *et seq.* Medicare is under the stewardship of the Secretary, who has the duty to promulgate regulations and policies specifying the health care costs which will be borne by Medicare. 42 U.S.C. § 1395hh; 42 C.F.R. §§ 405.401–405.488. The key concept in the Congressional enactments is that the Medicare program will reimburse health care providers for the reasonable costs actually incurred in providing services to eligible beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). Although the Secretary has considerable discretion in administering the Medicare program, her authority is limited in 42 U.S.C. § 1395x(v)(1)(A) which provides certain guidelines including the overriding principle that Medicare shall not subsidize non-Medicare related costs and, similarly, non-Medicare sources shall not pay for the costs of Medicare services. *Northwest Hospital, Inc. v. Hospital Service Corp.,* 687 F.2d 985 (7th Cir.1982); *St. John's Hickey Memorial Hospital, Inc. v. Califano,* 599 F.2d 803 (7th Cir.1979).

Provider hospitals, under the Medicare program, are reimbursed, in part, based upon the calculation of average per diem costs of services provided to eligible beneficiaries. The computation of the average, per diem cost of routine inpatient care is the subject of the dispute in this cause.

The plaintiff hospitals complain that the requirement of including the number of patients in the labor/delivery area in the computation of average per diem routine care costs while excluding the actual costs of the labor/delivery area from such computation results in the dilution of the average routine care cost figure. The hospitals assert that use of the diluted figure ultimately causes Medicare costs to be borne by non-Medicare sources.

In order to understand the issue presented by this case, it will be necessary to give a brief outline of both the reimbursement system and the administrative appellate process.

To be reimbursed for health care given to Medicare patients, providers present claims ("cost reports") to the "fiscal intermediary" which acts as the agent of the Secretary pursuant to 42 C.F.R. § 405.651. The fiscal intermediary which rules upon claims made by Indiana hospitals is Mutual Hospital Insurance, Inc. d/b/a Blue Cross of Indiana ("Blue Cross").

The plaintiffs each filed cost reports with Blue Cross in which the patients in the labor/delivery areas at the census taking hour (midnight) were not counted as patients receiving routine services. Blue Cross, by "Notices of Program Reimbursement" to each provider, disagreed and coun-

ted the patients. The hospitals then pursued the administrative appeals outlined by the Act and the Secretary's regulations. 42 U.S.C. § 1395oo(a); and 42 C.F.R. § 405.-1837. The plaintiffs were granted permission to pursue their appeals as a group appeal, since their claims presented common questions of law.

The first level of appeal was to the Provider Reimbursement Review Board ("PRRB"). This body is bound to comply with the Medicare Act, regulations promulgated thereunder, and all rulings, interpretive rules, and general statements of policy issued by the Health Care Financing Administration ("HCFA"). 42 C.F.R. § 405.-1867. The PRRB ruled, in a unanimous decision, that the hospitals were entitled to exclude labor/delivery area patients from the per diem cost of routine care computation.

The Deputy Administrator of HCFA, to whom the Secretary's power to review the PRRB's decisions has been delegated, reversed the Board's findings. The plaintiffs then filed for judicial relief from the Deputy Administrator's decision pursuant to 42 U.S.C. § 1395oo(f)(1). This provision provides for judicial review of the decisions of the PRRB or of any reversal, affirmance or modification of the PRRB's decisions by the Secretary in compliance with the Administrative Procedure Act. 5 U.S.C. § 701, *et seq.*

Two issues have been raised which must be dealt with before the merits may be reached. First, the plaintiffs' claim that the Secretary's delegation of authority to review the PRRB decision was wrongful, and that therefore the PRRB's decision in favor of the hospitals is the final decision in the case. Second, there is a heated dispute over the allowable scope of the Court's review.

### Authority of the Deputy Administrator, Standard of the Court's Review

Title 42 U.S.C. § 1395oo(f)(1) gives the Secretary the power to review decisions of the PRRB. The Secretary delegated this power to the Administrator of HCFA and therein specifically anticipated the redele-

gation, stating: "The authority in Section 1878(f) [42 U.S.C. § 1395oo(f)] ... may only be redelegated to the Deputy Administrator." 42 Fed.Reg. 57351 (Nov. 2, 1977). The hospitals contend that the aforesaid delegations were against the will of Congress since Congress had authorized the Secretary to review the decisions of the PRRB. This Court previously considered this issue in *Indiana Hospital Ass'n, Inc. v. Schweiker,* 544 F.Supp. 1167 (S.D.Ind.1982), *aff'd sub nom. St. Francis Hospital Center v. Heckler,* 714 F.2d 872 (7th Cir.1983), and found the delegations of authority to be proper. *Id.* at 1177–78. The Court's reasoning in the foregoing case is equally applicable here:

> The usual concern of courts in situations of delegation is that important quasi-judicial final decisions not be made by minor subordinates. This is not the case here. First, it is ludicrous to suppose that the Secretary of Health and Human Services could review all PRRB decisions personally. Second, the Deputy Administrator is not a minor official. Third, the very statute upon which the plaintiffs rely, 42 U.S.C. § 1395oo(f), provides for judicial review of the Secretary's decisions.

*Id.* at 1177.

Further, in *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123 (9th Cir.1980), the appellate court approved the district court's finding that delegations under HHS's earlier, but analogous, organizational structure to be proper:

> Under the Medicare Act, it is the Secretary who may reverse or modify a decision of the PRRB. 42 U.S.C. § 1395oo (f). However, section 8.D of HEW's "Statement of Organization, Functions and Delegations of Authority," 33 Fed. Reg. 5836 (1968), delegates the functions of the Secretary under the Medicare Act to the Commissioner of Social Security. The District Court correctly found that this was a proper delegation, and was properly exercised in this case.

*Id.* at 128 n. 11.

■ The delegations of authority to review PRRB decisions by the Secretary to

the Administrator, then to the Deputy Administrator were valid. The Deputy Administrator's decision, reversing the PRRB, therefore, must be considered as that of the Secretary and is entitled to equal deference. It is, therefore, the final decision constituting departmental policy, and it is this administrative decision, not that of the PRRB, which is reviewable by this Court.

The Court also notes that it will not consider the plaintiffs' claim that section 2345 of the *Provider Reimbursement Manual*[1] is procedurally invalid because of alleged lack of compliance with regulation publication procedures. The policy enunciated in HIM–15 § 2345 is embodied in the Deputy Administrator's decision. The Court's function is to review the administrative decision rendered against these plaintiffs.[2]

■ Generally, an agency's interpretation of its own regulations is given a large degree of deference by a reviewing court. An agency's decision will be overturned only when it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(A) and (E). Deference to the administering agency is, however, not total. In reviewing an agency's interpretation of one of its regulations, the Court "cannot be allowed to slip into a judicial inertia." *Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d at 690 (quoting *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 131 (9th Cir.1980). The weight to be given an agency's interpretation of a statute or regulation varies with the circumstances. *St. John's Hickey Memorial Hospital, Inc. v. Joseph A. Califano, Secretary of HEW*, 599 F.2d 803 (7th Cir.1979). Factors to consider include agency consistency and specific statutory limitations placed upon the agency's discretion. *North-*

*west Hospital, Inc. v. Hospital Service Corp., supra.*

In the present case, the Secretary's policy, as embodied in the Deputy Administrator's decision, requiring inclusion of labor/delivery patients in the routine care cost computation was not clear prior to the issuance of HIM–15 § 2345 in 1976. The defendants assert that the policy embodied in section 2345 was always the policy of the agency. Nevertheless, prior to 1976, the Secretary did not require or uniformly enforce its policy requiring inclusion of labor/delivery patients in the routine care cost computation. Blue Cross instructed provider hospitals, prior to the issuance of section 2345, to *exclude* labor/delivery patients at the census taking hour from the routine care cost figure. The Secretary's prior inconsistency on this issue leads the Court to more closely scrutinize the Secretary's present policy. Furthermore, as noted above, the Secretary's discretion is limited by specific statutory guidelines providing for reimbursement of actual costs incurred and proscribing cross-subsidization of Medicare and non-Medicare costs. 42 U.S.C. § 1395x(v)(1)(A).

Although the Secretary has broad discretion to develop "accounting methods" and "methods of calculation" to determine reasonable costs incurred by Medicare beneficiaries, the Secretary's prior inconsistency on this issue and the limiting provisions found in the statute, lead the Court to grant a somewhat lesser degree of deference to the Deputy Administrator's decision.

*The Medicare Cost Apportionment Process*

■ Under the Medicare program, provider hospitals are entitled to reimbursement for "reasonable costs" attributable to the care of Medicare beneficiaries. 42 U.S.C. § 1395f(a) and (b). The Secretary is

---

1. The *Provider Reimbursement Manual* (HIM–15) is issued by HCFA pursuant to a delegation of authority by the Secretary and contains interpretations of Medicare regulations. HIM–15 § 2345 was issued in 1976 and sets forth the departmental policy requiring inclusion of patients in the labor/delivery area at the census

taking hour in the computation of average per diem routine care costs.

2. The Court's ruling herein on the propriety of the Deputy Administrator's decision disposes of the issues presented. The Court declines to further consider how the labor/delivery area should be classified in the future.

authorized to promulgate regulations specifying the methods to be used and the items to be included in determining "reasonable costs" subject to the guidelines set forth in 42 U.S.C. § 1395x(v)(1)(A) which provides in part:

(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; . . . . Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . .

Any regulations or policies enacted by the Secretary or the HCFA must comport with these basic principles.

The regulatory analogue of § 1395x(v)(1)(A) is 42 C.F.R. § 405.451, which states in major part:

§ 405.451 Cost related to patient care.

(a) *Principle.* All payments to providers of services must be based on the reasonable cost of services covered under title XVIII of the Act and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost. . . .

(b) *Definitions*—(1) *Reasonable Cost.* Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this subpart take into account both direct and indirect costs of providers of services. The objective is

that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both title XVIII and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services rendered to beneficiaries during the year.

(2) *Necessary and proper costs.* Necessary and proper costs are costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity.

The Secretary has chosen to carry out the scheme outlined in § 1395x(v)(1)(A) by utilizing a series of average costs rather than by attempting the virtually impossible task of reimbursing the providers for exact costs for each patient. Basically, the Secretary has divided reimbursable services provided by specific areas of the hospitals into three types, which are treated differently: (1) general routine patient care areas, (2) special care units, and (3) ancillary service areas.

(1) General routine patient care areas basically are normal hospital beds. The "routine services" provided to the patients in these areas are defined by 42 C.F.R. § 405.-452(d)(2):

(2) *Routine services.* Routine services means the regular room, dietary, and nursing services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made.

The average costs for these areas are computed by dividing the total allowable inpatient costs for routine services by the total number of inpatient days of care. This yields the average cost per diem for general routine services. 42 C.F.R. § 405.452(d)(7).

(2) Special care units are treated separately from the routine care areas. The same "total costs divided by total inpatient days of care" calculation is used for special care units, 42 C.F.R. § 405.452(d)(8), which include intensive care units, coronary care units, burn care, pulmonary care and trauma care units. 42 C.F.R. § 405.452(d)(10). This section specifically excludes "post-operative recovery rooms, post-anesthesia recovery rooms, or maternity labor rooms." *Id.*

The costs in these first two areas, routine care and special care units, are allocated between Medicare and non-Medicare patients by multiplying the average per diem cost by the total number of Medicare inpatient days.

(3) Ancillary services are treated differently. These are "services for which charges are customarily made in addition to routine services." 42 C.F.R. § 405.-452(d)(3). Ancillary care areas are those in which routine care is seldom provided and are defined more fully in *The Provider Reimbursement Manual,* § 2202.8:

> *Ancillary Services.* Ancillary services in a hospital or an SNF include laboratory, radiology, drugs, delivery room (including maternity labor room), operating room (including post-anesthesia and post-operative recovery rooms), and therapy services (physical, speech, occupational). Ancillary services may also include other special items and services for which charges are customarily made in addition to a routine service charge.

HIM–15 § 2202.8.

The costs of ancillary services are allocated on the basis of the ratio of charges to Medicare recipients to charges to all other patients who have received care. 42 C.F.R. § 405.452(d)(6).

This is where the problems arise with the labor/delivery area patients. It would be indeed unusual for a Medicare patient to require such services. The crux of this lawsuit is the practice of HHS to count patients in the labor/delivery area at the census taking hour as users of routine services in the average per diem routine care cost computation while, because of the absence of Medicare patient utilization of the labor/delivery area, there is no possibility of the costs associated with this area being put into the ancillary services calculus. The hospitals claim that this method of calculation offends the express congressional prohibition against cross-subsidization contained in 42 U.S.C. § 1395x(v)(1)(A), which is echoed in the Secretary's regulation at 42 C.F.R. § 405.451(b)(1) above.

### Inclusion of Labor and Delivery Room Patients in the Routine Patient Care Total

Women in labor and delivery rooms at the census taking hour, approximately 30 per cent of the patients who deliver on a specific day, receive all of their care from personnel in this discrete area of the hospital. Routine services are defined above: they are rendered to patients in routine beds and are typically such things as meals, minor medical and surgical supplies, and costs associated with the maintenance of a ward bed. The departmental policy of including women in the labor/delivery area with those patients who are actually receiving routine services seems to be based upon the anticipation that these women will soon have their children, be moved to beds in post-natal maternity units and will then receive the benefit of these services. The Deputy Administrator rationalized the policy in the following manner:

> Admittedly, a labor/delivery room patient may not receive routine services until she actually leaves the delivery room. However, it must be recognized that these routine services are always available to her in the hospital. It is proper that an in-patient share in the costs of these services, no matter where that patient happens to be at the census-taking hour.

This policy conflicts with the fundamental principle that the allocation of costs between non-Medicare and Medicare patients be based upon "cost actually incurred," 42 U.S.C. § 1395x(v)(1)(A), and "actual services received." 42 C.F.R. § 405.452(b).

Nothing in the parties' briefs or in the nearly 1,500 pages of administrative record shows actual use of routine services by this group of patients. The overwhelming evidence is that women in labor are admitted to the hospital directly into the labor and delivery room area. They do not go to a routine care bed until after their babies have been born. Therefore, they do not receive the routine services delineated by 42 C.F.R. § 405.452(d)(2) until they actually are moved to a routine patient bed. The fiction of including these women as users of routine services is based upon an anticipation of use rather than upon an actual use of services. This does not comport with the pervasive "actual use," "actual costs incurred" principle established by Congress.

The government has argued that labor and delivery room patients should be counted as having received a day of routine inpatient care because labor and delivery room units are ancillary care units and all patients in ancillary services areas are counted as "inpatients" for purposes of calculating the number of "inpatient days." The Secretary defines this term at 42 C.F.R. § 405.430(b)(5):

> (5) *Inpatient day.* Inpatient day means a day of care rendered to any inpatient (except an individual occupying a bassinet for the newborn in the nursery). Effective for cost reporting periods starting after December 31, 1971, inpatient days will not include any days or care rendered to inpatients in an intensive care unit, coronary care unit, or other intensive care type inpatient hospital units.

This regulation is used by HHS to divide users of services into two groups for the purposes of the general care day count. Patients in the general routine patient care and the ancillary care areas are counted. Patients in the special care services areas are not counted as having received a day of routine care for purposes of the routine services per diem cost calculus.

The guideline at issue in this case now comes into play. HIM–15 § 2345 provides:

> If a patient is in the labor/delivery room at the census-taking hour, an inpatient day will be counted in the routine maternity care area. However, if the provider maintains records of labor/delivery room days, in addition to those recorded in the routine maternity care area, such labor/delivery room days should not be duplicated and should therefore be excluded from total inpatient days. These labor/delivery room days are not to be included in any statistical data used in the cost apportionment process.
>
> Where an inpatient is occupying any other ancillary area, such as operating room or radiology department, at the census-taking hour prior to occupying an inpatient bed, the patient's occupancy in the ancillary area should not be recorded as an inpatient day in the ancillary area. However, such patient must be included in the inpatient census of the routine care area. For additional information see § 216.1 of the *Hospital Manual* (HIM–10).
>
> Transfers of costs from the ancillary department to the routine care department are not permitted.
>
> For providers filing cost reports using form SSA–2552, or for providers filing under the combination method, the effective date of this policy is for cost reporting periods beginning on or after the first day of the month following original publication of this policy in this manual, i.e., September 1, 1976.

There are several critical reasons why the semantic argument of whether or not the labor and delivery room areas should be included in the general routine patient care count is not appropriate in the Court's consideration of whether HIM–15 § 2345 and the Deputy Administrator's decision in this case conflict with congressional policy against cross-subsidization.

On the narrowest level of analysis, important distinctions can be drawn between la-

bor/delivery areas and the other ancillary areas. Patients in the labor and delivery rooms do not have routine care beds: they are admitted to the hospital directly to the labor and delivery room area. Other inpatients who might be in other ancillary areas at the census taking hour would first occupy a routine care bed and would return to that bed after, for example, surgery, radiology treatments or physical therapy. These nonlabor/delivery patients have a great chance of actually using routine services, in marked contrast to the situation of the women delivering babies, all of whose care is given in the wholly separate labor/delivery area.

The one other ancillary area which represents an exception to this distinction is the emergency room. Patients are admitted directly to that area without first being placed in a routine care bed. However, two factors render this similarity to the labor and delivery room situation of no effect. First the average stay in an emergency room is seven or eight times shorter than that of a labor/delivery area patient, so the effect on Medicare reimbursement is significantly lessened. Much more importantly, the emergency room is directly analogous to the other ancillary areas (and in striking contrast to labor and delivery room units) in that it is utilized by both Medicare and non-Medicare patients, so that the portion of the costs associated with the treatment of Medicare patients is reimbursed.

This is the crucial distinction between the labor/delivery areas and all other ancillary care areas except nursery beds, which will be discussed below. There is no distortion of cost matching if patients in other ancillary areas are counted as patients who receive routine care. First, most of them actually do receive routine services on the day on which they might happen to be in physical therapy, the operating room, or being x-rayed. More importantly, even if they are included in per diem cost calculation, the effect washes out because costs associated with the Medicare patients who utilize these other ancillary services are also included.

The only ancillary area which is directly analogous to the labor/delivery area is newborn and nursery units, which also clearly are not utilized for Medicare patients. For unexplained reasons, the HHS has always treated patients in the nursery areas as the plaintiffs in this case ask that labor/delivery area patients be treated. Title 42 C.F.R. § 405.452(d)(7), the regulation which establishes the method for determining average per diem routine costs, specifically excludes nursery bed patients from the inpatient days count when the nursery costs are not included in routine service costs.

The PRRB's concluding statements in its review of this case are decisive on this issue:

The controlling Regulation is § 405.452(d)(7). That Regulation states that the "average cost per diem for routine services means the amount computed by dividing the total allowable inpatient cost for routine services by the total number of inpatient days of care (excluding newborn days where nursery costs are excluded from routine service costs)." The precise issue presented in this case is what is included in the regulatory term "inpatient days" as that term is used in Regulation § 405.542(d)(7). It is an established principle of interpretation that a regulation should be interpreted in a manner as to effectuate its purpose. The purpose of Regulation § 405.452(d)(7) is to determine average per diem routine costs. In order to effectuate the purpose of that Regulation, the divisor in the formula for computing average per diem costs, i.e., inpatient days, should not include days if the costs associated with those days are not included in routine costs. This conclusion is supported by the Regulation itself which parenthetically provides that the number of inpatient days excludes newborn days *if* nursery costs are excluded from routine service costs. Thus, Medicare recognizes that days are not properly included as inpatient days for purposes of computing average per diem cost if the costs associated with those days are not included in routine costs.

Therefore, the Board [PRRB] must find in the instant case that the position of the

Providers should prevail and the Intermediaries' adjustments are reversed.

PRRB Dec. No. 80–D67 at 6–7.

The fact that the HHS treats newborns differently than all other ancillary area patients is very important. First, it invalidates the government's arguments that ancillary areas must be treated in one specific way. Second, it is an implicit regulatory admission that if costs are not included in the numerator of the per diem routine care calculation, the patients responsible for those costs should not be channeled into the denominator.

The distortion of the Medicare reimbursement that results from the wrongful calculation adopted by the Secretary in the case of labor/delivery area patients is not minimal. The PRRB opinion in this case states that the effect of HIM–15 § 2345 resulted in more than a million dollars of nonreimbursement to the plaintiffs before it for the year 1977 alone. This effect is, to use the PRRB's language, irrational and contrary to the basic legislative policy of reimbursement embodied in 42 U.S.C. § 1395x(v)(1)(A), which is reiterated by the Secretary at 42 C.F.R. § 405.451(b).

As pointed out by Thomas M. Tierney, Chairman of the PRRB, in his concurring opinion of a PRRB decision on this issue, which was rendered subsequent to the administrative appeals in this case:

In reaching its decision in this case the Board [PRRB] is not unmindful of the recent reversals by the Secretary's delegate of PRRB Decisions. It is not the Board's intention or purpose to be defiant of or simply unaware of those reversals. Under the provisions of the Statute and regulations which make it clear that each appeal dispute before the Board stands on its own merits, the Board cannot bring itself to abandon the basic position which it has continuously and consistently maintained about this problem.     .

The basic question is not whether "labor room or delivery room" days are semantically included in the phrase "inpatient days". If that were the total scope of the argument, the Board would quickly pres- cind from its position. The dispute goes much deeper than that.

.    .    .    .    .

... [T]here can be no question but that the addition of the labor and delivery room days to total routine days results in a dilution of the other part of Medicare reimbursement which is based on average per diem costs. The result is that none of the costs of the labor/delivery room are picked up under RCCAC but the per diem routine costs is lowered and the Medicare reimbursement thereof. The very obvious solution to that dilemma is to disallow any of the costs of labor/delivery room and also refuse to recognize any of the days spent therein.

.    .    .    .    .

... The debate over whether or not an expectant mother who walks across the threshold of a hospital is an "inpatient" beclouds the issue. The issue involves the basic method of computing Medicare reimbursement. It is in this latter context that the problem should be addressed and resolved.

PRRB Dec. No. 80–D95 at 5–6. The Court is in complete accord with the above analysis of this issue.

The government has made several other arguments which, although lengthy and impassioned, do not withstand close scrutiny in light of the cross-subsidization inherent in the policies expressed by HIM–15 § 2345.

The defendants have pointed out that some of the plaintiffs make room assignments or reservations at the time a maternity patient is admitted to the hospital, in spite of the fact that the patients go directly to the labor/delivery area. The government's argument is that there are "standby costs" associated with rooms in the routine post-natal maternity units, which costs represent a portion of routine services. This contention is invalidated by the fact that standby costs are not taken into account for any other group of patients. The fact that some providers make room assignments is a matter of procedural efficiency alone. (See Administrative Record, Vol. I, at 0413.)

Since post-natal maternity units tend to have a low occupancy rate, estimated as 65 per cent on the average, it makes no practical difference when a room assignment is made.

Perhaps the most telling factor is that the government does not attempt to include nursery bed patients in the inpatient count. Surely there are standby costs associated with the beds to be occupied by the babies who will be born to the mothers in the labor/delivery area at the census taking hour. The attempts of HHS to treat these two analogous sets of standby costs differently are irrational.

The defendants' next argument is that some of the plaintiffs charge women who spend their first day in the hospital in the labor/delivery area for a day of routine care. It is axiomatic that Medicare reimbursement calculations are separate and distinct from a hospital's own accounting practices. The hospitals are free to charge their non-Medicare patients in whichever way is most convenient for them. If a provider chooses to charge lesser amounts for the labor and delivery rooms than it would if it did not compensate with adding a maternity room charge, it has no bearing whatever on the issue of Medicare reimbursement. (See Administrative Record, Vol. I, at 0414–0416.) As stated repeatedly above, Medicare calculations are based upon costs actually incurred, upon services actually rendered. The hospitals are free to develop their own charging practices for their non-Medicare patients. This issue, rather than "conclusively establish[ing the] reasonableness" of the HIM–15 § 2345 practice, as asserted by the government, has no bearing on it.

The defendants' last argument is that the Secretary is free to establish methods of computation and accounting mechanisms within her broad discretion to define reasonable costs. This is true, but irrelevant to the issue presented by this case. Section 2345 of the *Provider Reimbursement Manual* represents not a discretionary accounting method, but an irrational classification which is violative of the most fundamental principles of Medicare reimbursement. 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 405.-451(b). The effect of the policy articulated in HIM–15 § 2345 and sustained by the Deputy Administrator's decision in this case is to dilute Medicare reimbursement to the hospitals, which causes non-Medicare patients to bear a part of the cost of caring for Medicare patients in violation of the Medicare Act. The government may not mask a policy which violates the express will of Congress as a mere discretionary accounting option.

The Deputy Administrator's decision is hereby reversed. Judgment will be entered in accordance with this memorandum.