**CULPEPER MEMORIAL HOSPITAL, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 83–0491–R.**

United States District Court, E.D. Virginia, Richmond Division.

Aug. 28, 1984.

**1174**

John William Crews, Martin A. Donlan, Jr., Crews, Hancock & Dunn, Richmond, Va., James E. Edwards, Jr., and Ober, Kaler, Grimes & Shriver, Sanford V. Teplitzky, James B. Wieland, Baltimore, Md., for plaintiffs.

G. Wingate Grant, Debra J. Prillaman, Asst. U.S. Attys., Richmond, Va., Javier A. Arrastia, Asst. Regional Atty., Region III, Dept. of Health and Human Services, Washington, D.C., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This is a civil action brought pursuant to 42 U.S.C. § 1395oo (f) to review a final decision of the Secretary of the United States Department of Health & Human Services ("the Secretary"). The plaintiffs are Virginia hospitals who are approved providers of hospital services under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* Title XVIII establishes a federally-funded health insurance program for the elderly and disabled known as Medicare. Under Part A of the Medicare program, approved hospitals receive reimbursement directly from the program for services that they provide to such beneficiaries.

In this action a group of provider hospitals challenge one aspect of the formula that Medicare uses to determine the amount of reimbursement due to them. The challenged aspect of the formula involves the method of accounting for pa-

tients in a hospital's labor/delivery room area at the time the daily census of patients is taken. The complaint alleges that in 1976 the Secretary promulgated a new policy on accounting for such patients, in the form of Section 2345 of the Provider Reimbursement Manual (HIM–15). The hospitals claim that the policy unfairly dilutes the amount of their reimbursement, and they challenge its issuance on both procedural and substantive grounds.

The Court's jurisdiction over this challenge is premised on 42 U.S.C. § 1395oo (f)(1).[1] The matter is before the Court on cross-motions for summary judgment. The parties have fully briefed and argued the motions, and there are no genuine issues as to any material facts. Accordingly, the matter is now ripe for disposition.

### Substantive Background

The Medicare statute fixes the amount of reimbursement for provider hospitals at "the lesser of (A) the reasonable cost of such services.... or (B) the customary charges with respect to such services ..." 42 U.S.C. § 1395f(b)(1). The statute specifies that "the reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs...." 42 U.S.C. § 1395x(v)(1)(A).

The statute goes on to state guidelines to aid the Secretary in prescribing regulations on reasonable cost, in part, as follows:

... the Secretary shall consider, among other things, the principles generally applied by national organizations.... Such regulations may provide for determination of the costs of service on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services.... Such regulations shall ... take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined ... to be unnecessary in the efficient delivery of services ...) in order that ... the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [Medicare] ....

42 U.S.C. § 1395x(v)(1)(A).

The statute leaves to the regulations the method of prescribing formulas for reimbursement.

The regulations divide hospital costs into three groups and provide separate reimbursement formulas for each; the three groups are the costs of routine services, costs for services in intensive care type units, and costs for ancillary services (such as X-ray). 42 C.F.R. § 405.452(b)(1).[2] "Routine services" are "the regular room, dietary, and nursing services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made." 42 C.F.R. § 405.452(d)(2). "Ancillary services" are "the services for which charges are

---

1. The Secretary challenges the jurisdiction of the Court to entertain the claims of certain of the plaintiff hospitals, on the ground that they waived their objections by failing to raise them properly at all stages of the administrative review process. The Court recently resolved a similar claim against the Secretary in *Alexandria Hospitals v. Heckler*, 586 F.Supp. 581 (E.D. Va.1984). However, the conclusion of *Alexandria Hospitals* depends to an extent on exactly what steps the hospitals took or failed to take in the administrative process, so the ruling could not be applied to this case without some analy-

sis of the relevant procedural facts herein. The Court has determined that such an analysis and indeed any resolution of this jurisdictional issue is unnecessary in light of the Court's conclusion *infra* on the merits.

2. All citations to the Code of Federal Regulations are to the 1981 C.F.R. Edition. The 1981 regulations, which have been amended since that time, are controlling for purposes of this case.

customarily made in addition to routine services." 42 C.F.R. § 405.452(d)(3). Intensive care type units are defined with detailed criteria not relevant here. 42 C.F.R. § 405.452(d)(10). The amounts reimbursable in each of these three categories of costs are computed separately and then added together to yield the hospital's total reimbursement amount.

Only the formula for reimbursing routine service costs is involved in this dispute. That formula may be summarized as follows:

$$1.\ \begin{array}{l}\text{Average Cost of a}\\\text{Day of Routine}\\\text{Patient Care}\end{array} = \frac{\text{Total Allowable Routine Patient Care Costs}}{\text{Total \# of Inpatient Days of Care}}$$

$$2.\ \begin{array}{l}\text{Total}\\\text{Reimbursement} =\\\text{Due for Routine}\\\text{Patient Care}\end{array}\ \begin{array}{l}\text{Average Cost}\\\text{of a Day of}\\\text{Routine Patient}\\\text{Care}\end{array} \times \begin{array}{l}\text{\# of Inpatient Days}\\\text{Of Care Rendered to}\\\text{Medicare Beneficiaries}\end{array}$$

*See* 42 C.F.R. § 405.452(b)(1)(i) and (d)(7).

Quite simply, the first equation in the calculation determines the average per diem cost for routine services, which the regulations define as "the amount computed by dividing the total allowable inpatient cost for routine services (excluding the cost of services provided in intensive care units ... as well as nursery costs) by the total number of inpatient days of care (excluding days of care in intensive care units ... and newborn days) rendered by the provider in the accounting period." 42 C.F.R. § 405.-452(d)(7). In the second equation the average cost per diem is multiplied by the number of days of care provided to Medicare beneficiaries during the accounting period, which yields the total amount of reimbursement due for routine services.

The regulations do not further define "inpatient day," which is the denominator in the first equation and the focus of this dispute, in connection with the reimbursement formula for routine services. However, the same term is defined in a regulation dealing with another aspect of reimbursement determination [3] as "a day of care rendered to any inpatient" except for newborns or persons in an intensive care type inpatient hospital unit. 42 C.F.R. § 405.430(b)(5).

Additional guidance on reimbursement methods is found in the manuals that the Secretary issues to interpret the reimbursement regulations. Section 2202.8 of HIM–15 itemizes the categories of services that are to be treated as ancillary rather than routine services. Labor/delivery room services are to be treated as ancillary, which means that the costs of the labor/delivery rooms themselves are grouped with other ancillary care costs and are recouped from Medicare where appropriate in accordance with the Medicare ancillary care cost formula. The hospitals do not dispute the treatment of the labor/delivery room area as an ancillary care area.

Section 216.1 of Hospital Insurance Manual–10 (HIM–10) sets out the method for determining the "number of inpatient days of care" statistic (both the total and the number attributable to Medicare beneficiaries). The statistic is to be determined by an actual headcount of patients, to be conducted each night at midnight, the so-called "census-taking hour." This much the hospitals also do not dispute.

A question arises under the reimbursement rules discussed, supra, as to which patients should be included in the midnight headcount, to wit: If a patient is not physi-

---

**3.** 42 C.F.R. § 405.430 is a regulation concerning the "inpatient routine nursing salary cost differential," which allows providers to be reimbursed an additional amount for salary costs for nursing services to certain patients—aged, pe- diatric, and maternity patients—whose care requires above-average nursing costs. "Inpatient day" is defined for use in the formula that fixes the amount of the additional reimbursement.

cally located in a routine care area at the census hour, but is instead at that time located in an ancillary care area, should the patient be included in the count of patients for the routine services formula? If the answer is "yes" generally, should an exception be made for patients in the labor/delivery room ancillary care area?

Before 1976, the Secretary's position on this issue as applied to patients in the labor/delivery room area was unclear. From 1976 to the present, the Secretary's position has been and is that patients in all ancillary care areas at the census hour, including those in the labor/delivery area, must be included in the count. HIM–10 § 216.1 states this proposition generally for all ancillary care areas, and HIM–15 § 2345, which was issued in 1976, clarifies it specifically with regard to patients in the labor/delivery room area.

The plaintiffs challenge the policy embodied in HIM–15 § 2345, questioning the appropriateness of the Secretary's position as applied to patients in the labor/delivery room area. While the plaintiffs' arguments need not be fleshed out in detail at this point, a brief explanation of the essence of their challenge should hopefully put this background information in focus.

As the plaintiffs see it, the effect of HIM–15 § 2345 is that labor/delivery room patients must be included in the denominator of the first equation, which challenges average cost per diem for routine services, even though the attendant labor/delivery room costs are not included in the numerator of the equation. This computation method, the plaintiffs contend, unfairly dilutes their reimbursement for routine services, because when the denominator in the first equation goes up without a comparable increase in the numerator, the average cost per diem statistic goes down. When the lower average cost per diem statistic is plugged into the second equation in the reimbursement formula, the total reimbursement goes down as well.[4]

The Secretary agrees that under the policy labor/delivery room patients must be counted in the denominator and, because labor/delivery room services are ancillary rather than routine, labor/delivery room costs must be excluded from the numerator. However, the Secretary does not agree that this computation method unfairly dilutes reimbursement as the plaintiffs contend.

The Court notes that implicit in plaintiffs' argument is a factual assumption

---

**4.** The argument may be clarified by an example. *Assume the following:*
Total routine service costs = $10,000
Total routine inpatient days of care, *excluding* labor/delivery room days = 100
Labor/delivery room days of care = 5

1. Average Cost of a Day of Routine Inpatient Care $= \dfrac{\$10,000}{100} = \$100$

2. Total Reimbursement Due for Routine Inpatient Care $= \$100 \times 40 = \underline{\$4,000}$

*Alternatively, the Secretary's interpretation of the reimbursement formula would yield the following:*

1. Average Cost of a Day of Routine Patient Care $= \dfrac{\$10,000}{(100 + 5)} = \$95.24$

2. Total Reimbursement Due for Routine Patient Care $= \$95.24 \times 40 = \underline{\$3,810}$

Medicare Beneficiary days of care = 40
*If labor/delivery room days are excluded from the inpatient count as plaintiffs argue it should be, the reimbursement formula would yield the following:*

Thus, on these hypothetical facts the hospital stands to lose almost $200 per accounting peri-

which, although uncontested should be, for conceptual purposes, made explicit here. The assumption is that virtually no labor/delivery room patients are Medicare beneficiaries. If Medicare beneficiaries were as numerous proportionately among labor/delivery room patients as they are in the total routine care hospital population, then the inclusion of labor/delivery room patients in the routine care headcount would have no effect on the hospital's ultimate reimbursement. This can be seen as follows: while inclusion of labor/delivery patients would decrease the average cost per diem statistic just as the plaintiffs say, it also would increase the multiplier in the second equation (the "number of inpatient days of care rendered to Medicare beneficiaries") by the number of inpatient days of care provided to Medicare patients in the labor/delivery room area. So, in the second equation of the reimbursement formula, the average cost per diem statistic would decrease, but the "inpatient days of care to Medicare beneficiaries" statistic would increase. The two changes would cancel each other out exactly, if Medicare patients were proportionately as numerous among the labor/delivery room patients as in the routine care hospital population at large.[5]

As a practical matter, all parties acknowledge that Medicare beneficiaries are indeed not as plentiful among labor/delivery room patients as in the hospital at large. It is rare (although not unheard of or impossible) that a Medicare beneficiary is a woman of child-bearing capacity. However, plaintiffs' occasional suggestions that their argument is not dependent on this fact, and that this fact merely exacerbates the problem, are incorrect: absent this fact, plaintiffs' complaint loses much viability.

### Procedural Background

Medicare reimbursement to a given hospital is determined annually on the basis of a cost report that the hospital prepares. The hospital files the report with a so-called "fiscal intermediary," which audits the report and adjusts it, if necessary, to ensure compliance with the Medicare manuals and regulations. 42 U.S.C. § 1395h. If the hospital is not satisfied with the amount of reimbursement that the intermediary determines is due, the hospital may appeal the intermediary's determination to the Provider Reimbursement Review Board ("the Board"), which has the power to affirm, modify, or reverse the intermediary's determination. 42 U.S.C. § 1395oo(a) and (d). A decision of the Board becomes final unless the Secretary reverses or modifies it within sixty (60) days, which she may do on her own motion. 42 U.S.C. § 1395oo(f). The hospital may then seek judicial review of an adverse decision of the Board or the Secretary in accordance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* 42 U.S.C. § 1395oo(f).

---

od if the Secretary's interpretation is upheld.

**5.** In the example used in n. 4, *supra*, it was assumed that 40 of the 100 inpatients receiving routine care, or 40%, were Medicare beneficiaries. It also was implicitly assumed that none of the labor/delivery room patients were also Medicare beneficiaries, and hence that none of the labor/delivery room days were also Medicare beneficiary days. If we assume instead that Medicare beneficiaries comprise 40% of the labor/delivery room patients as well as 40% of other routine patients, then there would be 40% $\times$ 5 = 2 labor/delivery room patients who were also Medicare beneficiaries.

*Then the Secretary's interpretation of the reimbursement formula would yield the following:*

1. Average Cost of a Day of Routine Patient Care $= \dfrac{\$10,000}{(100 + 5)} = \$95.24$

2. Total Reimbursement Due for Routine Patient Care $= \$95.24 \times (40 + 2) = \underline{\$4,000}$

---

With these assumptions the hospitals' total reimbursement for routine patient care is the same under the Secretary's interpretation as it is under the plaintiffs'.

In this case, the intermediary required the plaintiff hospitals, over their objections,[6] to comply with HIM–15 § 2345 in computing their average cost per diem for routine services. Because they were thereby forced to include labor/delivery patients in their headcount, the hospitals' computed average cost per diem was less than it otherwise would have been and they consequently were entitled to less Medicare reimbursement than they would otherwise have received. The hospitals appealed the intermediary's determination to the Board. The Board in a 3–1 decision reversed the determination on the merits,[7] finding that the policy embodied in HIM–15 § 2345 would improperly dilute the hospitals' reimbursement. The Secretary, through her designee the Deputy Administrator of the Health Care Financing Administration (HCFA), then reversed the Board, upholding HIM–15 § 2345. This appeal followed.

## Discussion

The hospitals argue that the Secretary's policy on labor/delivery days violates the Medicare statutes and regulations; constitutes on uncompensated taking of their property without due process of law; and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 701 *et seq.* They also argue that the challenged policy represents a substantive change in Medicare policy that should not have been made without the notice-and-comment rulemaking safeguards of 5 U.S.C. § 553.

### Procedural Challenge

The Secretary acknowledges that she did not follow formal notice-and-comment rulemaking procedures in issuing HIM–15 § 2345, but she contends that there was no need for her to do so because the rule is merely interpretive.

■ The Secretary may not avoid formal notice-and-comment by characterizing a regulatory change as a mere "clarification" or "interpretation," *Fairfax Nursing Center, Inc. v. Califano,* 590 F.2d 1297, 1301 (4th Cir.1979). The Court is satisfied, however, that she has not attempted to do any such thing here. The regulations set out a detailed reimbursement formula that turns on, but does not define, the term "inpatient days." While the term appears to be self-explanatory, and it could reasonably be construed to have the meaning the Secretary now gives it, questions could and did arise concerning its application.

■ The Secretary answered those questions by giving an interpretation of the term in manual provisions HIM–15 § 2345 and HIM–10 § 216.1. "The [manuals] expressly [provide] that [they] do not have the force of regulations. Therefore, [they] need not have been promulgated in accordance with the standard notice and comment procedure. [citations omitted]." *Fairfax Nursing Center v. Califano,* 590 F.2d at 1301. Even under the test the plaintiffs suggest for distinguishing substantive from interpretive rules, *Continental Oil Co. v. Burns,* 317 F.Supp. 194, 197 (D.Del. 1970), the Court is satisfied that the contested manual provisions are interpretive. They are neither complex nor pervasive; they do not work a drastic change in existing law; they are not retroactive; and compliance engenders no practical difficulties of the sort the *Continental Oil* court envisioned.

### Substantive Challenge

#### A. Standard of Review

The Court must set aside an agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by

---

6. Actually, certain of the plaintiff hospitals made no objection to the fiscal intermediary, although they did attempt to object in an appeal to the Provider Reimbursement Review Board. *See* n. 1 *supra* and n. 7 *infra.*

7. The Board found for the Secretary on the jurisdictional issue raised as to certain of the plaintiff hospitals and consequently declined to entertain the appeals from those hospitals. Because of its resolution of the merits, the Court sees no need to review the Board's determination or the jurisdictional issue. *See* n. 1 *supra.*

substantial evidence. 5 U.S.C. § 706. The plaintiffs acknowledge that this is the applicable general standard, but they suggest that less deference than usual is due to the agency's interpretive policy challenged here.

The Fourth Circuit Court of Appeals has addressed the governing standard for interpretive rules in unambiguous as terms: "An agency's interpretation of its own regulations should be accepted by the courts unless it is shown to be unreasonable or inconsistent with statutory authority. [citations omitted.]" *Fairfax Nursing Center v. Califano*, 590 F.2d at 1301.

The plaintiffs suggest that less deference is due the policy challenged here because, they assert, the agency's interpretations on the issue have been far from consistent. "Varying decrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise." *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–142, 97 S.Ct. 401, 410–411, 50 L.Ed.2d 343 (1976); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

Medicare had no policy on labor/delivery room days before 1972; the issue apparently did not come to its attention before then. In October of 1972, the Blue Cross Association raised the issue in comments it submitted regarding a proposed new cost reporting form and accompanying instructions:

Since the specific cost of labor rooms is excluded, [from total routine service costs] it would be inappropriate to further dilute the inpatient routine per diem cost by including labor room days in total adult days. We therefore recommend ... exclud[ing] all labor room days from total inpatient days.... [8]

The Medicare Bureau apparently simply incorporated this suggestion in the final instructions issued in November, 1972: "If the provider maintains records of Labor Room days they should *not* be included in any of the inpatient day counts used for cost apportionment of routine services...." [9]

This interpretation of "inpatient days" appears directly contrary to the Secretary's present interpretation, although the record reflects at least some ambiguity: the instruction may have been intended only to prevent double-counting of labor/delivery room days by hospitals that kept a *separate* count of labor/delivery room days, in *addition* to their routine services count. [10] In any event, the record does not indicate that the November 1972 instructions represented the considered judgment of the agency on the issue at the time.

The agency shortly became aware that the November 1972 instruction was being interpreted to justify excluding patients in the labor/delivery room areas from the inpatient headcounts altogether, and in 1974 the agency set out to develop and clarify its position on the issue. It made some efforts to communicate its policy in 1974 and 1975, but the Secretary concedes that the policy was not finally clarified until July and August, 1976, when interpretive bulletins issued to intermediaries mandated the inclusion of labor/delivery room days in the inpatient headcounts.

The plaintiffs have not satisfied the Court that this history evidences significant prior inconsistent interpretations from the agency. *Cf. Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 991 (7th Cir.1982). The agency simply did not address the problem until November, 1972, and even then it apparently did not consider and resolve it in any deliberate fashion. Less than two years thereafter, when the agency became aware of how the 1972 instructions were being interpreted, the agency went to work on developing and

8. *See St. Mary of Nazareth v. Schweiker*, 718 F.2d 459, 464 (D.C.Cir.1983).

9. *Id.*

10. *See Administrative Record* ("R."), at 977.

communicating a clear policy, which it accomplished by 1976.

█ In the circumstances, the confusion and/or inconsistency in the pre-1976 period indicates only that the agency had not at that time formulated and expressed an informed judgment on the matter; it does not detract from the persuasiveness of the agency's informed judgment arrived at in 1976. This is not a case where the agency changed a long-established interpretation in response to changes in circumstances or information that made a prior interpretation more costly or difficult for the agency. The Court is satisfied that the Secretary has consistently adhered to the policy embodied in HIM-15 § 2345 from the time the agency's expertise was first focused on the problem to the present.

The contrary resolution of this issue in *St. Mary of Nazareth v. Schweiker*, 718 F.2d 459, 463–465 (D.C.Cir.1983) is not persuasive. Inconsistency in an agency's interpretations is not talismanic. It is relevant only insofar as it suggests that the agency's present interpretation is not based on a special "body of experience and informed judgment" that courts otherwise should properly turn to for guidance. *General Electric Co. v. Gilbert*, 429 U.S. at 142, 97 S.Ct. at 411. In *General Electric*, the agency's general counsel had formally issued an opinion letter, in response to a request, taking a flatly contradictory position from that which the agency adopted 4 years later. *Id.* On those facts, the existence of the earlier opposite position undercut the persuasiveness of the later position by suggesting that the agency's "informed judgment" could go both ways on the issue.[11] In our case, the agency's pre-1976 judgment was both unclear and uninformed, and it consequently takes little from the weight of the agency's 1976 judgment. This is especially so in light of the fact that the agency has much expertise relevant to this problem, both in general accounting and in hospital cost reporting

procedures. *See Batterton v. Francis*, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9.

## B. *Statutory Principles*

The plaintiffs argue that the Secretary's policy violates the statutory principles that reimbursement be based on costs "actually incurred" and that Medicare costs not be shifted to non-Medicare parties. 42 U.S.C. § 1395x(v)(1)(A). The policy, they argue, in effect apportions routine service costs to patients who are in the labor/delivery room area at the census hour, even though those patients are not actually incurring any routine service costs. The hospitals acknowledge that the census hour serves as an approximation for a 24-hour period of care. But, they argue, not only are the labor/delivery room patients not receiving routine services at the census hour, most of them have not received any routine services in the preceding 24 hours either, since most maternity patients are admitted directly to the labor/delivery room area without first occupying a routine service bed.

Up to 30% of the census hour labor/delivery room patients will not even receive routine services in the 24-hour period *after* the census hour, because for one reason or another they will be discharged from the hospital straight from the labor/delivery area. The hospitals acknowledge, however, that a solid majority of the labor/delivery room patients will receive routine care on the day following the census hour, because the norm is for a patient to be transferred to a routine care bed after giving birth. The length of stay in the labor/delivery room area is typically around 10 hours. Administrative Record, p. 805.

The Secretary, through the Deputy Administrator of HCFA, found on a number of grounds that patients in labor/delivery area do actually incur routine service costs. First, some hospitals—at least 13 of the 22

**11.** Even on the *General Electric* facts the agency's interpretation merited some degree of deference: "In short, *while we do not wholly dis-* count the weight to be given the 1977 guideline, it does not receive high marks...." 429 U.S. at 143, 97 S.Ct. at 411 (emphasis added).

plaintiff hospitals in this case—[12] formally admit a labor/delivery room patient to a routine care bed and make a routine care room assignment or reservation for her while she is in the labor/delivery room area. Thus, in some sense such a patient "incurs" the cost of the empty routine care bed being held for her. Even with hospitals that do not follow this procedure, the labor/delivery room patients incur "standby" routine service costs in the sense that the hospitals must insure that routine beds are available for them as necessary. The Medicare regulations expressly authorize the inclusion of normal standby costs as costs "actually incurred." 42 C.F.R. § 405.451(c)(3).

The plaintiffs argue that the standby costs that the hospital incurs on behalf of labor/delivery room patients should be treated just as are standby costs for patients that come to routine care areas from outside the hospital, which would mean that the other patients receiving routine services would absorb the costs. While the procedure the plaintiffs recommend would be reasonable, it is equally as reasonable to allocate those standby costs, as the Secretary has done here, to the patients who necessitate them, especially if those patients can be identified. The choice between the alternatives is for the Secretary, not the Courts, to make.

Second, wherever a patient is located in the hospital at the census hour, he or she incurs a portion of the hospital's "general and administrative costs"—administrators' salaries, malpractice insurance, etc. Depending on the hospitals' billing procedures, but especially if the hospital formally admits or assigns the labor/delivery room patient to a routine care area when she arrives at the hospital, her share of the general administrative costs would be added into the total routine services costs.[13] If Medicare apportioned to such a patient only her share of the costs accumulated in the labor/delivery ancillary care area, then no portion of general and administrative costs would be apportioned to her, and other patients—including Medicare patients—would be bearing her share of those costs.

The Court notes that the dissenter on the Provider Reimbursement Review Board relied on this latter argument in determining that he would generally uphold the Secretary's policy, but concluded that the policy could only fairly be applied to those hospitals that actually used such admission practices.[14] The Court rejects the latter solution, *inter alia* because the Secretary has a valid interest in fixing a consistent industry-wide rule.

The Court is satisfied from the two grounds heretofore discussed that patients in a hospital's labor/delivery room area do actually incur some routine service costs and consequently that apportioning to them some share of those costs does not violate the principle of allocating costs as they are "actually incurred."

The Deputy Administrator relied heavily on a third ground as well. According to a common industry practice that has been incorporated in the Medicare manuals,[15] an inpatient's day of admission counts as an inpatient day, but his or her day of discharge does not. The justification underlying this practice is as follows: Neither the day of admission nor the day of discharge is a full day, but if the two are added together and the patient is charged for only one of them, then on average the patient will be fairly charged for the care received. A patient admitted and discharged all in one day is counted as having received one full day of care.

The fact that the standard practice is to charge only for the admission day rather than only for the discharge day is an arbitrary choice that ordinarily would have no practical consequences. However, a labor/delivery room patient's admission day

---

12. R. 99–100.

13. *See* Dissenting Opinion of Richard A. Dudgeon to Provider Reimbursement Review Board Decision, April 20, 1983, R. 90–91.

14. *Id.*

15. *See* HIM–10 § 216.1.

is usually in the labor/delivery room area, whereas her discharge day is usually in a routine care area. If she is not counted as a routine care inpatient while she is in the labor/delivery room area, then the cost of her discharge day in the routine care area would not be allocated to her in any way. Consequently, the other routine care patients including Medicare patients, would end up bearing the costs of her discharge day.

*St. Mary of Nazareth* rejected this argument, reasoning apparently that the day on which the labor/delivery room patient is transferred to a routine care area would be counted as an admission day, just as if the patient had come to the routine care area from outside the hospital. 718 F.2d at 470. The Deputy Administrator of HCFA apparently assumed the opposite, i.e. that the transfer day would not be treated as an admission day.[16]

There is no evidence in the record to resolve this essentially factual question. The Deputy Administrator's assumption seems more likely reliable, if only because the *St. Mary of Nazareth* reasoning would imply that labor/delivery room patients are in effect outpatients until they are transferred, a claim the plaintiffs have not made. Nevertheless, because the issue cannot be resolved on this record, and because its resolution is not necessary to the Court's disposition of the case, the Court declines to place any weight on this proffered ground for the Deputy Administrator's decision.

The plaintiffs also argue that the Secretary's policy violates the statutory principle that Medicare reimbursement methods be consistent with the standardized definitions and reporting practices widely accepted in the hospital industry. The short answer to this argument is that the statute requires only that the Secretary *consider* industry standards; she is not required to adopt them. 42 U.S.C. § 1395x(v)(1)(A). *See also* 42 C.F.R. § 405.406(a).

In any event, the Court is satisfied that the Secretary's policy is not inconsistent with any widely accepted practice in this area. The policies of the 22 hospitals involved in this case suggest that if there is any widely accepted practice in this area, it supports the Secretary. A majority of the hospitals (15 of 22) charge their labor/delivery room patients for a routine care room, which is in effect exactly what the Secretary's policy does. Thirteen of the 22 formally admit such patients to a routine care bed, and 14 of the 22 make a routine care room assignment or reservation for them.[17] In light of these facts, the plaintiffs' reliance on certain American Hospital Association standards is particularly unpersuasive. Additionally, the standard they rely on is susceptible of various interpretations and is by no means unambiguously contrary to the Secretary's policy.

The hospitals argue that their charging practices have no logical relevance to the proper interpretation of the Medicare statutes and regulations. The Court disagrees. In addition to the maxim in 42 U.S.C. § 1395x(v)(1)(A) that the Secretary is to consider "principals generally applied by national organizations," the regulations explicitly incorporate customary charging practices as the key to defining both routine and ancillary services: routine services are those "for which a separate charge is not customarily made," whereas ancillary services are those "for which charges are customarily made in addition to routine services." 42 C.F.R. § 405.452(d).

### C. Accord with Regulations

The Court is satisfied that the Secretary's interpretive policy is consistent with and finds support in the Medicare regulations, setting out the applicable reimbursement formulas. The regulations' definition of ancillary services—"the services for which charges are customarily made in addition to routine services"—would be hard to square with a reimbursement scheme in which a patient could be treated as receiv-

---

**16.** R. 7.

**17.** R. 99–100.

ing *only* ancillary services—ancillary services are *in addition to* routine services. 42 § C.F.R. § 452(d)(3). Indeed, the entire regulatory scheme, and the use of the word "inpatient" itself, suggests that all patients other than outpatients—and newborns who are treated differently for obvious reasons—must be counted, consequently all patients must be counted either in routine services or in intensive care type services. The regulations simply do not leave room for creation of additional categories beyond the three—ancillary, routine, and intensive care—set out in the regulations.

The Deputy Administrator looked for guidance to the definition of "inpatient day" contained in 42 C.F.R. § 405.430(b)(5). That definition supports the Secretary's position that labor/delivery room days should be included as inpatient days. While the plaintiffs correctly point out that § 405.-430(b)(5) is part of a regulation not directly relevant to the issue at hand, they offer no reason why the purposes of § 405.430 would require a different definition of the term than would the purposes of § 405.452, which is the controlling regulation here. The regulations appear to be dealing with similar topics, and consequently the Deputy Administrator's use of § 405.430(b)(5) as guidance appears justified. Plaintiff's argument, which *St. Mary of Nazareth* adopted, 718 F.2d at 467, that borrowing the definition from § 405.430 would lead to ridiculous consequences in some circumstances is not persuasive. This *reductio ad absurdum* argument can be negated simply by giving the regulation a reasonable, common-sense, limiting construction so as to avoid the problem suggested.

### D. *Arbitrary and Capricious Test; Reasonableness*

The Secretary argues that the policy embodied in HIM–15 § 2345 is a reasonable attempt to fix a consistent policy for all ancillary care areas. Patients in the surgery area at the census hour are clearly still routing care inpatients, she argues, and logically must be included in the patient count. HIM–15 § 2345 simply applies the same rule to patients in the labor/delivery room area as is applied to those in other ancillary care areas. The plaintiffs argue that this approach ignores stark differences between the labor/delivery room area and other ancillary care areas. However, most of the differences they cite— e.g. few patients are located in ancillary care areas other than labor/delivery at midnight, and the biologically based underrepresentation of Medicare beneficiaries among labor/delivery patients is not replicated in other labor delivery areas—are differences without legal significance for the problem at hand, except that they point out why the plaintiffs are complaining only about the labor/delivery room patients.

This argument reduces to a claim that the Secretary's accounting method is too gross an approximation and should be more finely tuned so as to take into account differences amongst the ancillary care areas. The Medicare statute, however, expressly empowers the Secretary to use rough estimates. 42 U.S.C. § 1395x(v)(1)(A). *St. Mary of Nazareth* recognizes that "averaging is a tolerable method when there is ... some reason to believe that the premises for its use actually obtain." 718 F.2d at 473. The conclusion, *supra*, that labor/delivery room patients do actually incur some routine service costs supplies sufficient reason to believe the premises for the use of averaging actually obtained here.

The Secretary's policy relies on an averaging theory that assumes, for the purposes of calculating the average cost per diem of routine services, that all patients (including labor/delivery room patients) incur roughly the same amount of routine services costs per day. This assumption obviously will not be true in individual cases. In particular, although labor/delivery room patients do actually incur some routine service costs, they probably incur less than other routine service patients.

The Secretary's assumption, however, is that other distortions weigh against this one, and the "extreme divergences from the mean balance out." 718 F.2d at 471.

The Court is satisfied that this is not an unreasonable assumption. There are a number of stages of the accounting process at which counter-balancing distortions could exist. The labor/delivery room patients might, for instance, incur more than an average amount of routine service costs after their transfer to a routine care area. Or some other group of patients amongst which Medicare beneficiaries are underrepresented might incur more than its proportionate share of routine costs. Or patients in ancillary care areas other than the labor/delivery room area at the census hour might include an overrepresentation of Medicare patients, thus offsetting the underrepresentation in the labor/delivery room area.

The Secretary has suggested in her briefs that she may have evidence that would support one or more of these possibilities, but she has not attempted to prove any of them on the current record. The Court is satisfied that she need not make such proof. So long as labor/delivery room patients incur some routine service costs, the Secretary is justified in including them as routine service patients and in relying on the averaging process to work out any difference in the amount of such costs incurred by different groups amongst the routine service patients.

The plaintiffs have not attempted to demonstrate that the averaging process is not serving its purpose here. Instead they attempt—unsuccessfully—to shift the burden on this point to the Secretary.

This Court recently adjudicated a dispute between a group of Medicare provider hospitals and the Secretary over a newly promulgated regulation on reimbursement for malpractice insurance. *Alexandria Hospitals v. Heckler*, 586 F.Supp. 581 (E.D.Va. 1984). In that case, it was the Secretary who sought to single out a particular cost from the averaging process, allegedly because it was so disproportionately incurred by non-Medicare patients that the averaging process would be distorted if the cost was not treated separately. The Court held the Secretary to the burden of proving that the imbalance of which she complained was not cancelled out by other countervailing imbalances. *Slip Op.* at p. 588.

The same approach dictates that the plaintiffs bear the comparable burden in the circumstances presented here, at least in the absence of an established Medicare or industry practice of singling out the cost in question.[18] The plaintiffs have not met that burden.

### E. Constitutional Requirements

The hospitals have not argued their constitutional claims at any length in their briefs. Particularly in light of the fact that the policy in question has not been applied retroactively, the Court is satisfied that the constitutional challenge is wholly without merit. *See Fairfax Hospital Association v. Califano*, 585 F.2d 602, 606 (4th Cir. 1979); *see also Fairfax Nursing Center v. Califano*, 590 F.2d at 1302.

### Conclusion

▉ The Secretary has fixed a consistent interpretive rule applicable to patients in all ancillary care areas at the census hour, and

---

18. The *St. Mary of Nazareth* court also noticed the similarity between the position of the hospitals in the labor/delivery room dispute and that of the Secretary in the malpractice insurance dispute, but that court used the similarity to bolster its conclusion that the Secretary's plea for averaging should be rejected in the labor/delivery room dispute:

> Averaging was abandoned with regard to malpractice costs to avoid Medicare's bearing a disproportionate share of those costs. We see no reason to believe averaging should be any more sacrosanct here.

718 F.2d at 473.

The *St. Mary of Nazareth* court did not have the benefit of the numerous, recent district court opinions that have rejected the Secretary's position in the malpractice dispute and have reinstated the averaging principle that the Secretary had attempted to abandon there. *See Alexandria Hospitals, supra; Bedford County Memorial Hospital v. Heckler*, 583 F.Supp. 367 (W.D. Va.1984) and cases cited therein.

In this Court's view, *St. Mary of Nazareth* was right that the Secretary's positions on the two disputes were inconsistent but wrong on which of her two positions should be rejected.

her rule is consistent with the regulations and statutes it purports to interpret. The rule appears reasonable and neither arbitrary nor capricious, and the plaintiffs have not demonstrated that it distorts their ultimate reimbursement. Accordingly, the Secretary's policy will be upheld.

The Court is aware that a number of courts in addition to *St. Mary of Nazareth, supra,* have upheld the plaintiffs' challenge to HIM–15 § 2345. *Beth Isreal Hospital v. Heckler,* 734 F.2d 90 (1st Cir.1984); *Baylor University Medical Center v. Heckler,* 730 F.2d 391 (5th Cir.1984); *International Philanthropic Hospital Association v. Heckler,* 724 F.2d 1368 (9th Cir.1984); *Community Hospital of Roanoke Valley v. Heckler,* 588 F.Supp. 674 (W.D.Va.1984); *Johnson County Memorial Hospital v. Heckler,* 572 F.Supp. 1538 (S.D.Ind.1983); *Central DuPage Hospital v. Schweiker,* 4 MEDICARE & MEDICAID GUIDE (CCH) ¶ 33,451 (N.D.Ill. Oct. 19, 1983). The only precedent upholding the Secretary's position is *University of Tennessee v. U.S. Dep't of Health and Human Services,* 573 F.Supp. 795 (E.D.Tenn.1983), *remanded to Sec'y for additional evidence per agreement of parties,* 737 F.2d 579 (6th Cir. 1984). With the single exception of *Johnson County, supra,* the opinions holding for the plaintiffs have simply adopted the reasoning of *St. Mary of Nazareth,* with little or no elaboration.

The Court is of the opinion that the key difference between the approach that this Court has utilized and that taken in *St. Mary of Nazareth* lies in the amount of deference given to the Secretary's judgment on the matter. *St. Mary of Nazareth*'s evaluation of the history of HIM–15 § 2345 led that Court to treat the policy with a suspicion that this Court respectfully suggests is not justified. Although there are other differences between the conclusions reached herein and in *St. Mary of Nazareth,* some of which are addressed *supra,* they in all likelihood would not have led to different results absent the different approaches on the deference issue.

The Court is satisfied that the Secretary's policy should be upheld.

An appropriate order will issue.

### ORDER

For the reasons stated in the memorandum this day filed and deeming it proper so to do, it is ADJUDGED and ORDERED as follows:

Plaintiffs' motion for summary judgment be and the same is hereby denied.

Defendant's motion for summary judgment be and the same is hereby granted, and defendant stands dismissed without cost.