**ST. MARYS HOSPITAL MEDICAL CENTER, Plaintiff-Appellee,**

v.

**Margaret M. HECKLER, Secretary, Department of Health and Human Services, Defendant-Appellant.**

No. 84–1443.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 16, 1984.

Decided Jan. 22, 1985.

Rehearing and Rehearing En Banc Denied March 1, 1985.

Robert E. Mazer, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for plaintiff-appellee.

Barbara Altman, Asst. Regional Atty., Dept. of Health & Human Services, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, ESCH-BACH, Circuit Judge, and SWYGERT, Senior Circuit Judge.

CUMMINGS, Chief Judge.

This appeal arises from the challenge by St. Marys Hospital Medical Center ("St. Marys") to the Secretary of Health and Human Services' (the "Secretary") method of calculating St. Marys' apportionment of laboratory costs between Medicare and non-Medicare patients under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare"). The district court found in favor of St. Marys. We reverse.

## I

St. Marys is a short-term acute-care hospital located in Madison, Wisconsin. In 1972 it introduced a program, later known as Shared Laboratory Services ("SLS"), that was designed to spread the hospital's fixed laboratory costs. Through SLS, St. Marys, in cooperation with Methodist Hospital in Madison, sold laboratory services to non-hospital patients, including private physicians, clinics, and small hospitals. These clients would provide several services that the test-taking procedures required to be done and that St. Marys fulfilled for its own patients, *viz.*, ordering the tests, drawing and processing the sample, recording the test results in the patient's records. SLS provided its own courier service to transport samples to be tested and Methodist Hospital billed the SLS clients. The two hospitals shared the expenses of these two activities. St. Marys states that its SLS fees are lower than those it charges its own patients because of competition with commercial laboratories and allegedly lower costs (Br. 6). St. Marys admits that the costs of the SLS program exceed the revenue derived from it (*id.* at 30 n. 21.)[1]

Medicare reimburses St. Marys for the laboratory services provided Medicare patients by determining first the ratio of Medicare charges to total charges, and then multiplying total costs by that ratio. Thus if Medicare patients account for thirty percent of the laboratory's charges, then Medicare will reimburse the hospital thirty percent of its laboratory's total costs.[2] This formula assumes that the ratio of Medicare charges to total charges equals that of Medicare costs to total costs. To protect the integrity of this assumption, the Secretary requires a provider to "gross-up" any discounted charges to the level of the regular charges made to all other paying patients before the hospital calculates the ratio of Medicare charges to other

---

1. SLS is nonetheless profitable for St. Marys because the revenues exceed the program's marginal costs, which are quite low.

2. This scheme of reimbursement is the one applicable to 1978 and 1979, the cost years at issue. Congress has since radically changed the Medicare reimbursement system for cost years beginning after October 1, 1983. Pub.L. 98–21, Title VI. This new law does not affect the two years before us on this appeal.

charges. Not doing so would mean that total charges would equal less than would otherwise be the case, so that Medicare charges would comprise a larger percentage of the total, resulting in Medicare's bearing a disproportionately heavy burden of the laboratory's cost.

In 1978, St. Marys attempted to account for SLS' lower charges by revenue offset, subtracting SLS revenues from total laboratory costs and total charges before calculating the ratio of Medicare charges to other charges.[3] The intermediary[4] overseeing St. Marys' Medicare reimbursement refused to accept this method, requiring St. Marys to gross-up SLS charges instead. In 1979, St. Marys calculated the ratio of Medicare charges to total charges by including SLS revenues at their actual and not their grossed-up level. Again the intermediary disallowed this approach and required St. Marys to gross-up the SLS charges. In both years St. Marys justified its action by claiming that the SLS services were not similar to tests provided hospital patients, so that grossing-up was unwarranted. Moreover, St. Marys claimed that SLS services cost less than did the same tests provided to its patients.

St. Marys appealed both the 1978 and 1979 adjustments to the Provider Reimbursement Review Board ("PRRB" or the "Board"). The hospital also retained Ernst & Whinney, a national accounting firm, to conduct an industrial engineering work-measurement study to ascertain whether St. Marys could document both of its assertions—that the SLS services were markedly different from, and substantially less

expensive than, tests provided its patients. The PRRB rejected the Ernst & Whinney study as neither accurate nor verifiable and dismissed St. Marys' objections. The Secretary of course did not appeal this decision, so that it became the final administrative decision. St. Marys appealed to federal district court under 42 U.S.C. § 1395oo(f)(1). The trial court reversed the PRRB in a judgment entered December 30, 1983. Although agreeing that the Ernst & Whinney study was inaccurate "in some respects" (Mem. Order of Dec. 24, 1983 at 2),[5] it found that SLS costs in fact were always less than those of tests for hospital patients. The court remanded to the PRRB, ordering it to resolve any inaccuracies in St. Marys' study and to apply a method of cost apportionment that would not require grossing-up SLS charges. The Secretary filed a motion for reconsideration on January 9, 1984, but the trial court reaffirmed its decision on January 17, 1984. Notice of appeal was filed in this Court on March 15, 1984. We reverse.

## II

Plaintiff contends that the Secretary's notice of appeal was untimely because her motion for reconsideration did not seek specific relief, and, even if requisite specificity was present, it was not timely served. Fed.R.App.P. 4(a)(1) permits the government sixty days in which to file an appeal from a judgment. The filing of one of four post-judgment motions tolls this period.[6] Our jurisdiction depends on the adequacy of the motion for reconsideration filed by the Secretary.

---

3. St. Marys had used this method of accounting for the SLS costs since the institution of the program in 1972, evidently with the belief that revenue received from SLS exceeded its costs (Administrative Record ("A.R.") 212–214). This assumption was in error (*id.* at 213), but years prior to 1978 are not at issue in the current appeal.

4. The Secretary often contracts with private organizations known as "fiscal intermediaries" to reimburse providers their Medicare costs. 42 U.S.C. § 1395h. The intermediary in this case was Blue Cross Association/Blue Cross/Blue Shield United of Wisconsin.

5. The docket entries show that the judgment, although dated December 24, 1983, was not entered until six days later. Copies were mailed to counsel on December 29, 1983.

6. The four post-judgment motions include a motion for judgment n.o.v. under Rule 50(b); a motion to amend or make additional findings of fact under Rule 52(b); a motion to alter or amend the judgment under Rule 59(e); or a motion for a new trial under Rule 59. All four motions must be initiated within ten days of entry of judgment.

■ Plaintiff misunderstands the substantive requirements for a Rule 59 motion. The motion need only be in writing, specify the grounds on which the motion is based, and request relief. Fed.R.Civ.P. 7(b)(1); *Martinez v. Trainor*, 556 F.2d 818, 819–820 (7th Cir.1977). Even if the Federal Rules required that the requested relief as well as the grounds for it be set forth with specificity, the Secretary's instant motion meets these requirements. St. Marys' reliance on *Western Transportation Co. v. E.I. Du Pont de Nemours and Co.*, 682 F.2d 1233 (7th Cir.1982), is misplaced, for that case deals with the particularity of grounds for relief, not the specificity of the relief requested. In *Western Transportation,* the disputed motion asked the district court to reexamine its dismissal of some of the moving party's claims, without delineating any reasons whatsoever for the request. In contrast, the motion at issue here identified two specific errors in reasoning that the Secretary believed the trial court had made. The motion also requested that if the trial judge did not agree with the Secretary's interpretation, the district court either modify or clarify its remand order. Supp.App. 3–5. As such, the motion detailed both the action it requested and the reasons for its request, thus falling well within the specificity requirements of the Federal Rules.

■ Since the motion made does request "that the judgment be altered or amended," *Western Transportation,* 682 F.2d at 1236, it falls within the intent of Fed.R.Civ.P. 59(e). The critical factor in classifying a motion under Rule 59 is whether "the motion questioned the substantive validity of the judgment and not merely its form," *St. Paul Fire and Marine Insurance Co. v. Continental Casualty Co.*, 684 F.2d 691, 694 (10th Cir.1982). The Secretary fashioned her motion as fall-

ing within Fed.R.Civ.P. 52(b) rather than Rule 59(e) (Supp.App. 2 n. 1), but that fact is not dispositive. *Browder v. Director,* 434 U.S. 257, 261–262 n. 5, 98 S.Ct. 556, 559–560 n. 5, 54 L.Ed.2d 521. " 'Any motion that draws into question the correctness of the judgment is functionally a motion under Civil Rule 59(e), whatever its label.' " *United States v. City of Chicago,* 631 F.2d 469, 474 (7th Cir.1980) (quoting 9 Moore's Federal Practice ¶ 204.12[1], at 4–67 (2d ed. 1980)).

The more serious objection is that involving service. The Secretary concedes that through inadvertence her motion for reconsideration was not served on opposing counsel, though it was timely filed (Reply Br. 20). We assume *arguendo* that the motion would have had to have been both filed and served before it would have been timely for purposes of Fed.R.App.P. 4(a)(1). Nonetheless, the exception the Supreme Court enunciated in *Thompson v. Immigration and Naturalization Service,* 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404 (*per curiam*), applies here.[7] In *Thompson* the Rule 59 motion at issue was untimely because it was filed and served more than ten days after entry of judgment. The notice of appeal filed in the case would have been timely had the post-judgment motion tolled the appeals period. Opposing counsel did not object to the motion and the district court explicitly informed the moving party that its motion for a new trial was timely. In these circumstances, the Supreme Court refused to find that the court of appeals lacked jurisdiction and ordered it to hear the case on the merits. *Id.* at 386–387, 84 S.Ct. at 398–399.

■ The case before us is very similar. A post-judgment motion was filed that would have been timely had it been served.

---

7. The Secretary has urged us to extend to her motion our holding in *Hahn v. Becker,* 551 F.2d 741, 744 (7th Cir.1977), that a Rule 50(b) motion filed but not served within ten days was timely. This holding was premised on the language of Rule 50(b), which speaks in terms of a party who has "move[d] to have the verdict and any judgment entered thereon set aside." Both

Rules 52 and 59 require motions to be "made" within ten days to be timely. *Hahn* itself refused to decide whether its holding could be extended to a Rule 52(b) motion. In view of our decision that the *Thompson* exception applies, it is unnecessary to answer whether *Hahn* and the Federal Rules would justify the extension to the present motion that the Secretary requests.

The Secretary's notice of appeal also would have been timely had the post-judgment motion tolled the appeals period. In addition, the opposing party took no formal action cognizable by the court to oppose the Secretary's motion.[8] The district court gave the Secretary no explicit assurance that her motion was timely, as occurred in *Thompson,* but explicit assurance is unnecessary. In *Textor v. Board of Regents of Northern Illinois University,* 711 F.2d 1387, 1390–1391 (7th Cir.1983), we applied the *Thompson* exception to a motion that was both filed and served seven days late. There the district court gave the moving party implicit assurance that her motion was timely by considering it without mentioning any timeliness problem, and opposing counsel failed to raise the issue. The district judge in the instant situation gave the Secretary the same implicit assurance by issuing a six-page memorandum and order explaining his ruling denying reconsideration, and by not retracting that order *sua sponte* once St. Marys' counsel informally advised him of the lack of service.

Our applying the *Thompson* exception does not prejudice the plaintiff or greatly impose on the policies underlying the federal rules. The Secretary's motion itself met all substantive requirements of specificity and timeliness of filing. Cf. *Martinez v. Trainor, supra* (court rejected party's attempt in effect to extend filing deadline by filing a timely, skeletal motion that specified no grounds for the motion and supplementing the motion with specific grounds after the ten-day deadline had passed). Here the judge below ruled on the motion promptly, and he decided in the plaintiff's favor. The notice of appeal was filed only sixteen days after the deadline that would have applied had the post-judgment motion not been made. If St. Marys wished to object to timeliness, it should have raised that objection within sixty days of entry of the judgment, while the Secretary still had an opportunity either to file a notice of appeal or to request an extension of time in which to file an appeal. Plaintiff's counsel's attempt to capitalize on the Secretary's reliance he helped induce by seeking no relief in his letter to the district judge (see n. 8 *supra*) is hardly commendable. Considering all the circumstances, we hold that the decisions in *Thompson* and *Textor* govern. Because the district court's judgment was final under 28 U.S.C. § 1291 and the notice of appeal was timely under *Thompson* and *Textor,* the motion to dismiss the appeal is denied.

## III

■ The issue for review is the appropriateness of the intermediary's requiring St. Marys to gross-up its SLS charges to the level of its other laboratory charges before calculating the ratio of Medicare charges to total charges. As explained by the district judge,

"grossing-up" means that patient charges which are lower than those charged to regular hospital patients, including Medicare patients, are raised to the level of the regular patient charges before apportioning the laboratory charges between Medicare beneficiaries and others * * * so that Medicare reimbursement truly reflects the costs incurred by the provider for Medicare patients.

Mem. Order of Dec. 24, 1983 at 3–4.

We were informed at oral argument that the issue is one of first impression for the circuit courts of appeals.

The Medicare statute permits reimbursement of a participating hospital's reasonable direct and indirect costs necessary to the efficient delivery of health services to Medicare beneficiaries. 42 U.S.C.

---

**8.** Counsel for St. Marys did send a letter addressed to the district judge, thanking him for his decision refusing reconsideration and informing him that they had been unaware of the "request for reconsideration as we were never furnished a copy of the Secretary's motion" (Letter of January 25, 1984; Add. 3 to Reply Br.). Because this letter did not seek any relief and was not a motion within the requirements of Fed.R.Civ.P. 7(b)(1), the district court's considering it or its being entered on the docket and included in the record would have been improper. See Fed.R.App.P. 10(a).

§ 1395f(b)(1). The reimbursed costs should be actual costs, but the statute gives the Secretary wide latitude in developing methods of determining costs. *Id.* § 1395x(v)(1)(A).

The Secretary's regulations must receive great deference as actions of an administrative agency. A court may not invalidate them unless they are unsupported by substantial evidence in the record or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), applicable to Medicare by virtue of 42 U.S.C. § 1395oo(f)(1). Methods of reimbursement that shift costs properly allocable to the care of Medicare patients to non-Medicare patients, and vice versa, are impermissible. 42 U.S.C. § 1395x(v)(1)(A). If the Secretary's decision meets these requirements, we cannot overturn it merely because we might have decided differently. *Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 990 (7th Cir.1982).

Medicare regulations do permit providers, under certain circumstances, to use alternatives to orthodox methodology. The alternative advocated must be demonstrably "more sophisticated." 42 C.F.R. § 405.453(d)(2)(ii). The burden is on the provider to produce verifiable and auditable cost data to persuade the intermediary to accept the alternative methodology. *Id.* § 405.453(a), (c).[9]

The grossing-up requirement has its genesis in 42 C.F.R. § 405.452(d)(6) (1982) (recodified without change in 1983 as § 405.-452(b)): "Charges refer to the regular rates for various services which are charged to both beneficiaries and other paying patients who receive the services. Implicit in the use of charges as the basis for apportionment is the objective that charges for services be related to the cost of the services." The Administrator of the Health Care Financing Administration reminded intermediaries in March 1980 in Intermediary Letter 80–8 that hospitals should gross-up discounted laboratory charges such as those for the SLS services St. Marys provides in order to avoid cross-subsidization. Supp.App. 96. This directive assumes that the cost of SLS-type services approximates that of the corresponding testing services the hospital provides its regular patients. The hospital's decision to charge its clients less, for reasons of competition or for any other reason, should not affect the cost-apportionment process.[10]

---

**9.** These regulations provide in pertinent part:

(a) *Principle.* Providers receiving payment on the basis of reimbursable cost must provide adequate cost data. This must be based on their financial and statistical records which must be capable of verification by qualified auditors. The cost data must be based on an approved method of cost finding * * *.

* * * * * *

(c) *Adequacy of cost information.* Adequate cost information must be obtained from the provider's records to support payments made for services rendered to beneficiaries. The requirement of adequacy of data implies that the data be accurate and in sufficient detail to accomplish the purposes for which it is intended. Adequate data capable of being audited is consistent with good business concepts and effective and efficient management of any organization, whether it is operated for profit or on a nonprofit basis. It is a reasonable expectation on the part of any agency paying for services on a cost-reimbursement basis.

**10.** St. Marys argues that the intermediary's reliance on Intermediary Letter 80–8 was improper because the letter allegedly constitutes a substantive change in Medicare policy and so should have been promulgated and published pursuant to a provision of the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(D). The hospital also argues that the grossing-up required by the Intermediary Letter is an inappropriate retroactive application of principles established after the cost years at issue. The district court properly rejected both contentions summarily. As Judge Shabaz observed, Intermediary Letter 80–8 is a logical corollary of the definition of charges in Section 405.452(d)(6) of the regulations and as such constituted no new policy (Mem. Order of Dec. 24, 1983 at 8–9).

St. Marys contends further that the question at issue is not one of cost apportionment at all, but of allowance of cost, because the SLS clients are not patients within the meaning of the regulations. But the laboratory testing services provided are allowable costs. The tests themselves do not differ from tests St. Marys provides its patients. The samples on which the tests are performed come from people who are patients elsewhere. Thus St. Marys cannot be allowed to treat the SLS testing costs as non-allowable

In order to avoid grossing-up, St. Marys must establish that its SLS services in fact differ from laboratory services provided its own patients, and that the SLS services are less costly.[11] Even if the SLS tests differ from the tests St. Marys provides its own patients, as long as their cost to the laboratory equals that of the hospital's tests of its patients, grossing-up maintains a constant cost-to-charge ratio.[12] With this ratio the same, the ratio of Medicare charges to total charges will remain constant, and Medicare reimbursement will not be disturbed. Requiring grossing-up in that situation would be rational, and the Secretary's decision could be justified. Only when the cost of a dissimilar service is less than the hospital's service would grossing-up unfairly minimize the amount of reimbursement to which St. Marys would be entitled. Consequently the factor determinative of the acceptability of the Secretary's requiring

costs such as television and other luxury items. Nor is SLS analogous to programs in which hospitals may participate that are quite distinct from any service the hospital provides its own patients. Cf. *Monsour Medical Center (Jennett, Penn.) v. Blue Cross and Blue Shield Ass'n/Blue Cross of Western Penn.*, PRRB Dec. No. 84–D133, [4] Medicare and Medicaid Guide (CCH) ¶ 34,138 at 10,105 (1984) (three programs—Drug and Alcohol Program, Driving While Intoxicated Program, Women, Infants and Children Program—operating with their own personnel and facilities found to be "not related to patient care services"); *St. Joseph Hospital (North Providence, R.I.) v. Blue Cross and Blue Shield Ass'n/Blue Cross of Rhode Island*, PRRB Dec. No. 84–D126, [4] Medicare and Medicaid Guide (CCH) ¶ 34,126 (1984) (Meals On Wheels Program). Determining whether a cost is allowable or not based on the identity of the patient would cause all costs not associated with St. Marys' Medicare beneficiaries to be disallowed and would destroy the cost apportionment process entirely. Treating the SLS services as services provided to non-Medicare beneficiary patients, and then apportioning the laboratory's total costs between Medicare beneficiaries and non-Medicare beneficiaries, is much more reasonable than treating the services themselves as non-allowable costs.

**11.** If SLS testing procedures are similar to those St. Marys provides its patients, then even if they cost less, grossing-up is an appropriate exercise of the Secretary's authority. Exact cost determination is not feasible, and the reimbursement procedures are based on the assumption that the cost of the same procedure will differ from patient to patient, and from some categories of patients to other categories of patients. See *Culpeper Memorial Hospital v. Heckler*, 592 F.Supp. 1173, 1184–1185 (E.D.Va.1984) (accounting for patients in a hospital's labor/delivery room area; court held existence of counterbalancing distortions justified Secretary's policy); *Alexandria Hospital v. Heckler*, 586 F.Supp. 581, 588–589 (E.D.Va.1984) (malpractice insurance; court held Secretary had not carried burden of proving that countervailing imbalances did not correct imbalance of which she complained). These varying costs will average out, and basing Medicare payments on this average by requiring a uniform charge is fair. St. Marys does not challenge grossing-up of similar charges for similar services. The hospital contends instead that SLS is different from the laboratory's other procedures and that it costs less.

**12.** *Johns Hopkins Hospital (Baltimore, Md.) v. Blue Cross Assoc./Blue Cross of Maryland, Inc.*, PRRB Dec. No. 81–D62, [1981–2 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 31,430, is not to the contrary. The PRRB there refused to allow an intermediary to require a hospital to use net Medicaid charges and gross total revenues in determining the Medicare cost-to-charge ratio. Instead both the Medicaid numerator and the total-charges denominator had to be net of blood replacement credits, so that the numbers in the ratio could "compare like statistics, apples to apples, not apples to oranges, if the objective of cost apportionment is to be met." *Id.* at 9167. What was discounted from the numerator had to be discounted from the denominator. Thus the case did not address the problem here of a service that was different from another service but cost the same. The PRRB was concerned about the relationship between the mark-up over cost of the SLS charges and the mark-up of the laboratory's corresponding testing charges to its patients. A.R. 205–206, 233–234. The Board was also concerned about possible arbitrariness in the manner in which the hospital increased its SLS charges and possible disregard by St. Marys for a consistent relationship between costs and charges (A.R. 213–215, 245–246).

The problem is one of services where the costs are the same, but the hospital applies a different mark-up over cost, resulting in different prices. Thus cases involving different charges for different and less expensive services, or for differing degrees of services, applied uniformly throughout the hospital are also not to the contrary. In those cases demonstrable differences in costs justified price differences. See, *e.g., Sheppard and Enoch Pratt Hospital v. Blue Cross and Blue Shield Ass'n/Blue Cross of Maryland*, Decision of Administrator, affirming, PRRB Dec. No. 84–D16, [4] Medicare and Medicaid Guide, (CCH) ¶ 33,905 (1984).

St. Marys to gross-up its SLS charges is whether a cost differential exists. St. Marys' failure to prove that such a differential existed with an accurate and verifiable cost study justified the adverse PRRB decision. The district court erred in asserting that the PRRB had in fact accepted the existence of a cost differential but was quibbling over minor inaccuracies in St. Marys' study. This logic misinterprets the thrust of the administrative decision.

The crux of the PRRB's decision was its conclusion "that the Provider's study did not establish the cost of providing services to non-Provider patients for the years 1978 and 1979" (PRRB Dec. 83–D42 at 6). The Board supported this conclusion by noting several discrepancies in the study: both St. Marys and its accounting firm indicated "a lack of confidence that the cost study" accurately reflected the SLS costs; the pathologists' fees were not properly allocated in the cost computation initially submitted to the Board; the Provider never used the results of the study to adjust its charges to either inpatients or SLS patients; the SLS charges had been established on an arbitrary basis, without consistent price markups in later years; and the accounting firm's testimony indicated that SLS revenues were insufficient to meet the costs of the service.

Other evidence in the record also supported the PRRB's decision.[13] Thus the Provider's study was conducted specifically to prove that SLS costs were less than laboratory testing St. Marys provided its own patients, suggesting an initial bias in the study. It focused on only one blood test, the SMAC, that accounted for forty-three to forty-six percent of total SLS test volume, thus ignoring the remaining tests that together accounted for the majority of the SLS test volume. It evidently did not properly allocate the costs of the SLS courier service. Ernst & Whinney conducted its study for one week in January four years after the accounting years in issue, from which limited figure it purported to project annual costs accurately. Moreover, the study was never validated by subsequent reviews.[14] The PRRB concluded that the cost computations "would have to be accurate and verifiable before their use could be considered as a more sophisticated method of cost apportionment" (*id.* at 7). This conclusion, coupled to the earlier declaration that the study failed to establish SLS costs, provides a clear negative inference that the Ernst & Whinney study was neither accurate nor verifiable.

The district court agreed with the PRRB that inaccuracies did inhere in the Ernst & Whinney study. The court noted: the costs of the pathologist who supervised the laboratory operation and the costs of supervising the SLS courier services may have been improperly allocated; the costs of collecting specimens may have been overstated; the period of the study may not have been representative of the accounting years at issue; and the costs of tests done on St. Marys' patients at an outside hospital may have been improperly allocated. The court then observed that although "it is arguable that St. Marys' witnesses resolved some or all of these questions, the Board was not obliged to accept the testimony" (Mem. Order of Dec. 24, 1983 at 10). The judge concluded "that the questions were raised and that the evidence of possible inaccuracy is in the record. Thus, the Board's decision concerning inaccuracy cannot be overturned." (*Id.*)

Despite this conclusion, the district court believed that the PRRB had made an implicit finding that SLS costs were cheaper,

---

13. Although the PRRB did not cite this evidence specifically in its decision, it did include it in its outline of the intermediary's objections to St. Marys' accounting methods. This evidence was before the Board and reference to it is justified to illustrate that evidence in the record additional to what the Board chose specifically to cite supports the Board's decision. As long as substantial evidence in the record justifies the Board's decision, we must affirm it.

14. A close reading of testimony in the administrative record by Ernst & Whinney's expert does not justify St. Marys' assertion that the study was verified (A.R. 330–331). See discussion *infra* pages 1371–72.

"in fact were significantly cheaper, to perform than the same tests done for hospital patients" (*id.* at 11). Ernst & Whinney had broken down the one test they examined into twelve steps, of which three steps were technical ones performed by laboratory personnel. St. Marys argues that this single fact establishes that the SLS tests are different and cheaper to perform. Yet the hospital has not provided any information substantiating this assertion. The bulk of the cost of the tests may very well lie in their technical components; the breakdown of the test into component parts alone is not dispositive of cost. St. Marys assiduously avoids mentioning that it shares the costs of four additional steps through the SLS courier service and the hospital's billing arrangements, thus being responsible for the costs of seven of the necessary steps. Until the hospital can prove that such costs as ordering and collecting specimens comprise a significant percentage of the test's total cost and that St. Marys does not in any way bear these costs or their equivalent when SLS testing is involved, the hospital cannot assert that a cost differential exists. Without a cost differential, grossing-up is of course entirely proper.[15]

Contrary to the assertion of the court below, the existence of a cost differential was very much in issue. St. Marys' claim depends on the cost question, because the hospital justified its argument that the services were dissimilar with the assertion that a cost differential existed. Compare, *e.g.*, St. Marys Br. 25–26 (SLS tests less expensive because fewer steps involved) with *id.* at 28 (tests dissimilar because few steps in common). See also *id.* at 37 ("uniform charges result in an accurate allocation of costs only when there are uniform costs"); A.R. 248 (Mr. LaFrombois, St. Marys' Director of Fiscal Services, testified that St. Marys' position was that cost dif-

ferential justified charge differential). The necessity of establishing that a cost differential exists rests with the hospital, not with the Board. The district court reasoned that the PRRB reached the question of the accuracy of St. Marys' alternative methodology because the procedures were in fact dissimilar and SLS costs were substantially less. But the PRRB stated explicitly that the cost study "did not establish" SLS costs. This conclusion carries the opposite implication, that St. Marys failed to prove the cost differential on which its argument depends. Therefore, the district court's reasoning must be regarded with suspicion. Nor do we find that the PRRB made the implicit finding that a cost differential existed, as the district court suggests. Once the PRRB found the cost study to be inadequate, no further inquiry was necessary. St. Marys had failed to carry its burden of proving that a cost differential between SLS costs and regular laboratory costs existed. As a result, the agency had no need to address whether the services were similar or dissimilar. Its failure to do so does not indicate that the Board believed a cost differential existed.

St. Marys' difficulty lies in its concession that the costs of the SLS program exceed the revenue SLS produces (Br. 30 n. 21).[16] This fact means that revenue offset will not accurately account for SLS costs, as some SLS costs will remain even after the total SLS revenues have been applied. Multiplying the ratio of Medicare charges to total charges by the remaining costs, including some unspecified amount of SLS costs, will result in Medicare's reimbursing St. Marys for some costs for which the program is not responsible. The method of reimbursement St. Marys proposed for 1979 would similarly distort the reimbursement process. The inequality in the cost-to-charge ratio for SLS charges would im-

---

**15.** See *supra* n. 12 and accompanying and following test. St. Marys' pricing of its SLS program was motivated primarily by competition with commercial laboratories, not by a *bona fide* belief that the services cost less. See, *e.g.,* A.R. 233–234.

**16.** This concession does not vitiate St. Marys' argument that a cost differential exists. Conceding that revenue does not cover costs is not conceding that SLS costs are less than those of the laboratory testing that St. Marys provides its patients.

permissibly minimize total charges, thereby increasing the ratio of Medicare charges to total charges and causing Medicare again to overreimburse St. Marys. The two remaining alternatives-cost offset and constant cost-to-charge ratio—reduce to the same thing (Secretary's Br. 15–16). Cost offset would require St. Marys to subtract SLS charges and SLS costs from total charges and total costs, respectively, before calculating the Medicare charge to total charge ratio. The second method grosses-up SLS charges until the ratio of SLS charges to SLS costs equals that of other charges to other costs (Secretary's Br. 28). Because both of these approaches rely on the exact cost of SLS services, an inability to determine that figure with sufficient accuracy renders them useless for cost apportionment purposes. St. Marys would be entitled to avoid grossing-up SLS charges and rely on either of these alternatives only when it could prove the extent to which SLS costs were less than those of St. Marys' other laboratory tests.

Substantial evidence in the record supports the PRRB's decision that St. Marys failed to carry its assigned burden of proof. A good illustration is one of the examples the PRRB cited as evidence that St. Marys' management lacked requisite confidence in the accuracy of the Ernst & Whinney study. Board member Houdek was questioning Edward LaFrombois, St. Marys' Director of Fiscal Services, concerning the implications for reimbursement when SLS costs exceed SLS revenues, as even the Ernst & Whinney study indicated they did. Mr. LaFrombois initially refused to accept that the revenue offset method would cause Medicare to cross-subsidize the SLS program (A.R. 216). When asked to justify his position, Mr. LaFrombois finally admitted that cross-subsidization would occur, "[a]ssuming that those costs [that the study reflected for 1978 and 1979] are adequately representing the cost of SLS" (id. at 217). This qualification caused Mr. Houdek to question Mr. LaFrombois about his confidence in the accuracy of the accountants' cost study, a question Mr. LaFrombois would never answer directly and to which he finally responded "[w]e feel it is an accurate reflection within the state of the art" (id. at 217–218). The Board correctly realized that whether the study represented "the state of the art" was not the question. The issue was the study's accuracy, and St. Marys gave the PRRB sufficient reason to refuse to rely on its cost study.[17] St. Marys would vindicate its study by contending "that a number of different tests * * * established that the study was accurate within 1%" (St. Marys' Br. 40). But the testimony St. Marys cites to support this claim does not support its assertion. George Whetsall, the management specialist at Ernst & Whinney responsible for the cost study, testified that manipulating their collected data in two different ways yielded results within one percent of each other (A.R. 330–331). He did not testify that later studies verified the cost study, and he did not testify that Ernst & Whinney's underlying assumptions and categorization of the data were correct. Because a study's results are only as reliable as the way in which the study is set up and conducted, Mr. Whetsall's statements are little more than self-serving manipulations of data that may have been fundamentally flawed.

A very different situation appeared in *St. Mary's Medical Center (Knoxville, Tenn.) v. Blue Cross Association/Blue Cross & Blue Shield of Tennessee*, PRRB Dec. No.

---

17. Board member Dudgeon also brought inaccuracies in the Ernst & Whinney study to light in his questioning of Mr. LaFrombois. See A.R. 237–242. David Shanahan, St. Marys' expert witness on Medicare accounting principles, testified as follows:

Chairman Tierney: But am I about right? Yours aren't—you don't really know what the costs are. Hell, none of us know what the costs are, do we?

The Witness: That's right.
A.R. 392.
Mr. Shanahan, like St. Marys' other witnesses, nonetheless continued to assert that whatever the costs, SLS tests were cheaper to perform than the comparable tests St. Marys conducted for its patients.

79–D79 [1980 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 30,337.[18] The controversy there centered on laboratory services quite similar to the SLS program at issue before us. In that case the Board disapproved of grossing-up. As in the instant situation, the cost study showed that hospital laboratory personnel conducted only two of nine steps involved. The court below used this fact to assert that the cost study in the instant case necessarily proved that SLS services were less expensive than other laboratory tests. The Tennessee case, however, will not withstand such an extension. Two other facts of much greater importance controlled the result reached there. The PRRB explicitly found the cost study to be accurate, a finding completely contrary to the one it reached with regard to the Ernst & Whinney study. The study there also demonstrated that revenue from the program exceeded costs, so that revenue offset was appropriate and a precise cost determination was unnecessary in order to allocate the laboratory's total costs accurately. The district court conceded that the PRRB "correctly" determined "that costs exceeded revenues, thus precluding a revenue offset" (Mem. Order of Dec. 24, 1983 at 13). It relied on *St. Mary's Medical Center (Knoxville)* because it believed that in both cases the hospitals had established a cost differential. The Tennessee hospital was able to do so; St. Marys has failed to do so in the instant case.

Much closer in point than *St. Mary's Medical Center (Knoxville)* is *Lake Region Hospital Corp. v. Heckler,* 602 F.Supp. 109 (D.Minn.1983). Again the facts are substantially the same. The main difference is that the PRRB identified an error factor in the Lake Region cost study of as much as twenty-five percent. Although the Board did not quantify an error factor in the instant case, its failure to do so is not fatal. For reasons that are unclear, the district judge determined that the "unverifiable portions" of St. Marys' study were not significant and that "St. Marys clearly established the existence of a cost difference, while Lake Region did not" (Mem. Order of Jan. 16, 1984 at 3, 2). He apparently assumed from his own assessment of the record that only portions of St. Marys' study were unverifiable, that those portions were insignificant, and that a cost differential had been established. Some evidence in the record might support such an assessment. But the real question is not the assessment the trial judge might be inclined to make but whether substantial evidence in the record supports the determinations made by the PRRB. The failure by the court below to address meaningfully this latter question constitutes reversible error.[19] The PRRB unequivocally stated that the cost study did not establish costs, so that the presence or absence of a cost differential could not have been established either. Substantial evidence in the record indicates that the cost study contained serious flaws. Therefore, the PRRB's refusal

**18.** The Deputy Administrator of the Health Care Financing Administration, acting under authority delegated by the Secretary, affirmed this decision in *St. Mary's Medical Center (Knoxville, Tenn.) v. Blue Cross Assoc./Blue Cross & Blue Shield of Tennessee,* Decision of Administrator, affirming, PRRB Dec. No. 79–D79 [1980 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 30,432.

**19.** As a reviewing court, the district court is bound by the same deferential standard of review that binds us and that was discussed *supra* page 1366. The district court's failure to affirm the PRRB decision that substantial evidence in the record supported requires us to reverse that decision. Disregarding that substantial evidence in favor of other conflicting evidence was improper, because the conflicting evidence

when reviewed in context does not detract from the persuasiveness and weight of the evidence upon which the PRRB relied.

The Secretary also alleges that the district court erroneously considered material outside the administrative record when it allowed St. Marys to include correspondence between an official of the Health Care Financing Administration, Bernard Patashnik, and another Medicare provider. Because the district court did not rely on this letter to reach its decision, but only referred to it as setting forth one possible alternative to grossing-up that the PRRB might require St. Marys to use on remand, we need not decide whether the court below erred in allowing St. Marys to bring the letter to the court's attention.

to accept it is amply justified. What seems to have influenced the district judge the most in deciding to the contrary was testimony by the intermediary's witness that the intermediary would require St. Marys to gross-up charges for tests with the same name, regardless of their respective costs and regardless of whether the services provided were the same or not. Even if this position of the intermediary were error, considering it fails to address the question whether the cost study was sufficiently reliable. St. Marys has not met the burden of proof required by 42 C.F.R. § 405.453(a), (c).[20] Accordingly the district court's judgment is reversed.