**PROVIDENCE HOSPITAL OF TOPPENISH; Providence Hospital of Anchorage; Providence Hospital, Rehabilitation Unit of Anchorage; Providence Hospital of Everett; Providence Hospital of Everett, Rehabilitation Unit, Plaintiffs–Appellants,**

v.

**Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant–Appellee.**

No. 94–35031.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 1995.

Decided April 4, 1995.

Robert E. Mazer, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for plaintiffs-appellants.

Esther R. Scherb and Thomas W. Coons, Office of Gen. Counsel, Dept. of Health and Human Services, Baltimore, MD, for defendant-appellee.

Before ALARCON and BRUNETTI, Circuit Judges, and KELLEHER.*

KELLEHER, District Judge:

Sisters of Providence hospitals (providers) appeal from the district court's summary judgment order affirming the determination of the Secretary of Health and Human Services (Secretary) disallowing the use of a "blended" interest rate for purposes of Medicare reimbursement.

Under the Medicare Act, 42 U.S.C. § 1395 et seq., hospitals are reimbursed for interest costs that are "actual" and "necessary." See 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. 413.153(a)(1) (1994). In addition, the Medicare program must seek to prevent cross-subsidization.[1] See 42 U.S.C. § 1395x(v)(1)(A). In denying reimbursement of interest costs according to a "blended" interest rate, the Secretary interpreted the provisions of the Medicare Act to bar reimbursement of interest costs that were not incurred directly by each hospital. On appeal, the providers contend that the Secretary applied the Medicare regulations arbitrarily, denying the providers the benefit of a lower interest rate obtained as a result of group financing. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## BACKGROUND

The material facts are not in dispute. This action involves a dispute between Providence Hospital of Toppenish, et al. (collectively, the providers), and Donna E. Shalala, Secretary, Department of Health and Human Services (Secretary), regarding Medicare reimburse-

ment for interest costs incurred by the providers for the 1986 cost reporting period.

The providers are acute care hospitals in Washington, Alaska, Oregon and California, all managed and operated by the Sisters of Providence organization. The Sisters of Providence organization is comprised of three non-profit corporations: Sisters of Providence in Washington, Sisters of Providence in Oregon, and Sisters of Providence in California.

The Secretary is responsible for administering the Medicare program, which provides medical assistance to eligible beneficiaries, and a mechanism for reimbursing hospitals for the costs of providing that care. See generally 42 U.S.C. § 1395 et seq. (1994). The Health Care Financing Administration (HCFA), an agency within the Department of Health and Human Services, administers the Medicare program. Payment to Medicare providers is carried out through private organizations, such as Blue Cross and Blue Shield Association, which act as intermediaries on behalf of HCFA. See 42 C.F.R. § 421.5(b). Based on cost reports submitted by providers, intermediaries determine the reasonable cost of services rendered Medicare patients and the Medicare payments due the providers. If providers disagree with the reimbursement decisions made by the intermediaries, and if the amount in controversy exceeds $10,000 ($50,000 for a group appeal), they may appeal to the Provider Reimbursement Review Board (PRRB). 42 U.S.C. § 1395oo. The intermediaries represent HCFA before the PRRB. The Board's decision is the final decision of the Secretary unless the Administrator of HCFA reverses, modifies or affirms the Board's decision. 42 U.S.C. § 1395oo(f)(1).

Prior to the period at issue, each Sisters of Providence corporation borrowed needed funds independently using taxable debt issuances. However, anticipating large capital expenditures, the three corporations devel-

---

* Honorable Robert J. Kelleher, Senior United States District Judge, for the Central District of California, sitting by designation.

1. The Medicare regulations prescribe that the costs of providing care to persons covered by

Medicare shall not be borne by persons not covered by Medicare and that those persons covered by Medicare shall not bear the costs of those persons not so covered. See 42 U.S.C. § 1395x(v)(1)(A) (1994).

oped a plan to use tax-exempt debt by borrowing as a group under a master trust indenture agreement. The corporations borrowed together as an "obligated group" under four fixed rate bonds (one issuance in each of the four states) and one variable rate bond. Each state corporation signed a series of cross-guarantees, pledging the total assets of the group. Therefore, the assets and revenues of each corporation were exposed to liability arising out of the total debt.

The combined size and financial strength of the group allowed it to obtain a large amount of variable rate debt,[2] a riskier type of debt, at a lower interest rate than the providers could have obtained had they borrowed individually. In addition, the group was able to obtain an improved bond rating and lower interest rates on fixed rate bond issues.

The total amount of debt required by the group was $309,570,580. Because proceeds from a particular state bond authority could not cross state lines, the entire amount could not be borrowed from a single bond authority. Therefore, money was borrowed from bond authorities in each of the states in which the hospitals were located.[3] However, because variable rate debt is costly to issue, the providers decided to use a single bond authority to issue the variable rate debt. Therefore, all the variable rate bonds were issued through the Washington bond authority.

Initially, each provider paid the principal and interest for the debt issuances from its state bond authority at the applicable rate. The central management office of the providers then accounted for the interest costs of the various providers by averaging all the interest rates together to create a "blended" rate.[4] In order to share in the benefits of the lower rate obtained as a result of the group financing, the providers made a series of cross-payments or equalizing payments such that each provider's payments were equal to the blended rate. During 1986, the blended rate was approximately 7.8 percent.

Each of the providers claimed interest costs on its Medicare cost report based on the overall rate of interest incurred, i.e. 7.8 percent. Some intermediaries accepted the blended rate while others rejected it. Where the blended rate was rejected, the intermediaries reimbursed each provider at the interest rate of the bond issuance from which the provider actually received loan proceeds (the actual rate).

Upon the decision by several intermediaries to reimburse at the actual rate, the providers appealed to the PRRB. The PRRB issued a decision in favor of the providers, finding that use of the overall rate of interest was proper as that rate accurately represented the interest costs actually incurred by each provider under the terms of the master trust indenture agreement. In addition, the PRRB found that the use of an overall interest rate did not arbitrarily shift costs among the providers because the manner in which interest was assessed to the providers was consistent with the integrated nature of the providers' systemwide financing. Accordingly, the PRRB held that the providers were entitled to additional reimbursement.

The Administrator reversed the PRRB, finding that the providers must be reimbursed according to the interest rates actual-

---

**2.** The providers incurred 30 percent of total debt in variable rate bond issues.

**3.** The borrowing was as follows:

| State | | Taxable/<br>Tax–Exempt | Variable/<br>Fixed Rate | Amount<br>Borrowed | Interest<br>Rate |
|---|---|---|---|---|---|
| 1. | AK | Tax–Exempt | Fixed | $102,535,580 | 8.93% |
| 2. | OR | Tax–Exempt | Fixed | $ 58,000,000 | 8.75% |
| 3. | WA | Tax–Exempt | Fixed | $ 16,730,000 | 8.97% |
| 4. | WA | Tax–Exempt | Variable | $ 89,000,000 | 4.93% |
| 5. | CA | Tax–Exempt | Fixed | $ 43,305,000 | 8.70% |
| | | | **TOTAL:** | $309,570,580 | 7.80% |

**4.** It is undisputed that the master trust indenture agreement did not include in its terms payment

ly charged on the bonds from which they received proceeds. Use of the providers' "actual, individual interest rates," the Administrator found, enables "Medicare payment [to] match the interest rates to the Provider's utilization rates." This method ensures that the program "is protected from reimbursement based on a higher than actual rate of interest where there is a low rate of Medicare utilization."

The providers appealed to the United States District Court for the Western District of Washington. The district court upheld the Secretary's decision, finding that her interpretation of the Medicare statutes and regulations was not "arbitrary, capricious or an abuse of discretion."

## ANALYSIS

### I.

We review the Secretary's decision pursuant to the provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* (1994). The APA, which is incorporated by the Social Security Act, *see* 42 U.S.C. § 1395oo(f)(1), directs that review of the Secretary's decision be limited to determining whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). *See Thomas Jefferson University v. Shalala,* — U.S. —, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

We must give "substantial deference" to "an agency's interpretation of its own regulations." *Id.* at —, 114 S.Ct. at 2386 (citations omitted). Therefore, "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation,'" we must defer to the Secretary's interpretation. *Id.* at —–—, 114 S.Ct. at 2386–87 (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)).

### II.

■ All parties agree that interest costs are allowable costs under the Medicare Act.

*See* 42 C.F.R. § 413.153(a)(1). However, allowable interest costs are limited to those expenditures that are "necessary and proper." *Id.* The providers contend that in the instant case, "necessary and proper" costs can be determined only by the use of a blended rate due to their use of a system-wide financing program which enabled the providers to obtain lower interest rates and a higher percentage of variable rate debt.

The providers also contend that because there is no Medicare statute specifically applicable to the calculation of interest costs based on group financing, generally accepted accounting principles (GAAP) must be applied. GAAP utilize a blended rate in determining interest costs based on group financing.

In contrast, the Secretary contends that necessary and proper interest costs are only those which were actually paid by the providers according to the bond issue from which they received funds. Moreover, the Secretary asserts that specific Medicare regulations are applicable and therefore GAAP do not apply. Namely, 42 C.F.R. § 413.153, supplemented by interpretative guidelines in the Provider Reimbursement Manual (PRM), provide specific directives for determining reimbursable interest costs.

The Secretary further contends that use of a blended rate is disallowed by the Medicare Act's prohibition against cross-subsidization. Such prohibition prevents persons receiving Medicare coverage from bearing the healthcare costs of those persons not so covered and vice versa.

### A. Regulations Determining "Reasonable Costs."

The Secretary is required to reimburse hospitals only for the "reasonable cost" of providing medical care to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A).

This regulation defines "reasonable cost" as:

> the cost *actually incurred,* excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery

according to a blended interest rate.

of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included.... (emphasis added).

*Id.*

■ The Secretary has substantial discretion to develop methods of determining costs. *Good Samaritan Hosp. v. Shalala,* — U.S. —, —, 113 S.Ct. 2151, 2154, 124 L.Ed.2d 368 (1993); *St. Mary's Hosp. Med. Ctr. v. Heckler,* 753 F.2d 1362, 1367 (7th Cir.1985), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985) However, such discretion is limited by the Secretary's mandate to prevent cross-subsidization. The regulations dictate:

under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the [Medicare program] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [the Medicare program].

42 U.S.C. § 1395x(v)(1)(A); *see Charter Peachford Hosp., Inc. v. Bowen,* 803 F.2d 1541, 1544 (11th Cir.1986).

### B. Regulations Determining "Necessary and Proper" Interest Costs.

Neither party disputes that interest costs are allowable costs pursuant to the Medicare Act. *See* 42 CFR § 413.153(a)(1). Interest is defined as "the cost incurred for the use of borrowed funds." § 413.153(b)(1). However, only the portion of each provider's interest on capital indebtedness that is "necessary and proper" and attributable to Medicare patient utilization is reimbursable under Medicare. *See* § 413.153(a)(1).

The term "necessary" requires that interest be:

(i) Incurred on a loan made to satisfy a financial need of the provider ...; [and]

(ii) Incurred on a loan made for a purpose reasonably related to patient care.... § 413.153(b)(2).[5]

Both parties to the instant action agree that necessary and proper expenditures are those which were "actually incurred." *See* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.5(a). However, each party contends that its method of calculation reflects "actual" costs.

The providers contend that the use of the blended interest rate most accurately represents the interest costs actually incurred by each provider. Because these interest costs arose from an integrated financing system where the borrowing was undertaken by the entire group, lower rates and a higher percentage of variable rate debt was possible. Without the participation of the entire group, the providers argue, these favorable rates could not have been obtained. The providers further argue that because each provider was legally responsible for obligations arising out of the total debt, each incurred a portion of the total interest costs. In addition, the state corporations, acting independently probably could not have assumed such a high percentage of variable rate debt. Therefore, the providers contend, to reflect the overall risks and benefits assumed by each of the providers, interest costs can be apportioned only according to a blended rate.

The Secretary takes the position that because all reimbursements must take "account of the actual use of services by ... [Medicare] beneficiaries," use of an overall interest rate is improper. § 413.5(b)(3). In other words, equalizing crosspayments by the providers to each other, for which an overall blended rate of interest is claimed for Medicare reimbursement purposes, blurs the Medicare utilization rate. The overall interest rate cannot precisely reflect the specific costs incurred to satisfy the needs of the individual provider to render services to its Medicare patients. Because the Secretary's

---

5. The term "proper" further requires that interest be:

(i) Incurred at a rate not in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made; and

(ii) Paid to a lender not related through control or ownership, or personal relationship to the borrowing organization....
§ 413.153(b)(3).

determination to disallow reimbursement according to a blended interest rate was reasonable and consistent with the Medicare regulations, we must affirm her interpretation.

## C. The Provider Reimbursement Manual.

In addition to the regulations, interest expense is addressed in the Provider Reimbursement Manual (PRM). The PRM is an extensive set of informal interpretative guidelines and policies published to assist intermediaries and providers in applying the reasonable cost reimbursement principles.

The PRM supports the contention that Medicare policy directs each provider to report actual interest expense. Sections 202.2 and 2150.3(B) of the PRM, which were effective for the cost reporting period at issue, specifically address reimbursable interest costs.

Section 202.2 addresses "necessary" interest expense, defining it in much the same way as the regulations. Section 2150.3(B) addresses the allocation of costs in a chain organization.[6] This section provides:

> The initial step in the allocation process is the direct assignment of costs to the chain components. Allowable costs incurred for the benefit of, or directly attributable to, a specific provider or nonprovider activity must be allocated directly to the chain entity for which they were incurred. For example, where such costs are paid by the home office, interest expense is allocated to the facility for which the loan was made.

The court in *Fairview Community Hospitals Group Appeal,* PRRB Decision No. 87–D43, *aff'd, Fairview Hospital v. Bowen,*

¶ 37,063 CCH Medicare and Medicaid Guide, Civ. No. 4–87–316, 1988 WL 235563 (D.Minn. 1988), the only court that has previously addressed this precise issue, found PRM § 2150.3(B) to be determinative, stating· that it specifically addresses how costs in a group organization are to be accounted for. *Id.* at 16,601.

We disagree with the providers' contention that the PRM and *Fairview v. Bowen* are inapplicable here. Although this Circuit has previously determined the legal status of the PRM as merely a " 'guide ... [without] the binding effect of law or regulation,' " *National Medical Enterprises v. Bowen,* 851 F.2d 291, 293 (1988) (quoting *Phoenix Baptist Hospital & Medical Center v. Heckler,* 767 F.2d 1304 (9th Cir.1985)), such determination is nevertheless consistent with our position. Certainly, the PRM "was never intended to establish Medicare policy." *Id.* However, in the instant case, the PRM guidelines are not in conflict with substantive Medicare regulations. The guidelines merely provide further clarification, consistent with the regulations.

## D. Generally Accepted Accounting Principles ("GAAP").

In the absence of a specific Medicare policy addressing the method of determining a particular cost, generally accepted accounting principles (GAAP) should be applied.[7] *See* 42 CFR §§ 413.20, 413.24 (1994); 41 Fed.Reg. 46292;[8] *See also Villa View Community Hospital, Inc. v. Heckler,* 720 F.2d 1086, 1093 n. 18 (9th Cir.1983). According to the providers, the requirement found in the regulation at 42 CFR § 413.153 that interest must be "incurred on a loan made to satisfy a financial need of the provider," is not determinative in the instant case. The providers assert that such regulation addresses when interest costs are reimbursable but does not

---

6. A chain organization for purposes of the Medicare program is defined in PRM § 2150 as any organization that "consists of a group of two or more health ·care facilities which are owned, leased, or through any other device, controlled by one organization."

7. GAAP consists of the official publications of the American Institute of Certified Public Accountants (AICPA). These official publications consist of Accounting Principles Board (APB) opinions, Financial Accounting Standards Board (FASB) Statements, and Accounting Research Bulletins (ARB). In the event there is no official

pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP.

8. This regulation provides: "[G]enerally accepted accounting principles are applicable to Medicare cost determinations only when a cost situation is not covered by 20 C.F.R. Part 405 [recodified at 42 C.F.R. Part 413] or the Provider Reimbursement Manual. It is only in the absence of health insurance program policy that generally accepted accounting principles should be followed."

address how interest costs are to be computed. Therefore, because no specific regulation is applicable, the providers contend that GAAP are determinative.[9]

However, the providers' reliance on *Villa View v. Heckler, supra,* is without merit. In that case, the court stated:

> where the Secretary has not prescribed different accounting practices by regulation, the Secretary must apply generally accepted accounting principles to determine whether a particular cost claimed by a provider is reimbursable under the Medicare Act.

*Id.* at 1093, n. 18.

While the court's decision in *Villa View* directs the Secretary to utilize GAAP in the absence of specific regulations, the court also noted that the Secretary is at liberty to prescribe other methods when GAAP "do not accurately reflect the cost of patient care, as opposed to the cost of running a business. . . ." *Id.* (citing *North Clackamas Community Hosp. v. Harris,* 664 F.2d 701, 706 n. 16 (9th Cir.1980)). Moreover, the Supreme Court has recently held that § 413.20(a) does not bind the Secretary to reimburse according to GAAP. *See Donna E. Shalala. Secretary of Health and Human Services v. Guernsey Memorial Hospital,* —— U.S. ——, 115 S.Ct. 1232, 131 L.Ed.2d 106 (the Secretary's decision not utilize GAAP is "supported by the regulation's text and the overall structure of the regulations").

The providers' reliance on *National Medical Enterprises,* (NME) *supra,* is similarly unfounded. In that case, the court found that when a regulation is "silent on the subject [of accounting methods] . . ., the regulation establishing general principles for cost reporting must be deemed applicable." *Id.* at 294. *NME* is distinguishable from the instant case. In *NME,* the Secretary had determined that the accrual method of accounting did not apply to cost reporting of return-on-equity capital. However, the Secretary could point to no specific regulation, other than a PRM guideline, which directed this method of calculation. *Id.* Moreover, the Secretary admitted that Medicare regulations required hospitals to use the accrual accounting system in most other situations. *Id.* at 293. Under those circumstances, the court held that because the PRM does not have the effect of law, the Secretary could not arbitrarily decide to disregard GAAP without specific support from the Medicare regulations. *Id.* at 294.

In contrast, in the instant case, a blended rate is not customarily used by providers or by Medicare. In addition, the PRM at issue is consistent with Medicare regulations. As a result, the Secretary did not act arbitrarily or capriciously when she relied on the PRM's interpretative guidelines to disallow a blended interest rate.

We conclude that the Secretary's interpretation disallowing use of a blended interest rate is consistent with the purpose of Medicare in that use of an actual interest rate protects against cross-subsidization. As a result, the Secretary's construction was not arbitrary or capricious. For the foregoing reasons, we affirm the ruling of the district court.

AFFIRMED.

---

9. For purposes of this appeal, it is undisputed that GAAP utilize a blended rate to determine interest costs based on group indebtedness.